PHYLLIS RAVIN, Plaintiff-Appellant, v. A.H. ROBINS COMPANY, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—88—0257

Opinion filed April 4, 1989.—Supplemental opinion filed on denial of rehearing May 16, 1989.

HARTMAN, J., dissenting.

Erwin, Cohn & Associates, of Chicago (Charles A. Cohn, of counsel), for appellant.

Arlene C. Erlebacher and Barbara M. DeCoster, both of Sidley & Austin, of Chicago, for appellee.

JUSTICE EGAN* delivered the opinion of the court:

The plaintiff, Phyllis Ravin, filed a complaint against Searle Pharmaceuticals, Inc. (Searle), for personal injuries she allegedly incurred by use of an intrauterine device known as a CU-7, manufactured by Searle. In substance, the complaint alleged that the device was defectively designed. The court allowed the defendant's motion for summary judgment on the ground that the complaint had been filed after the expiration of the statute of limitations. (Ill. Rev. Stat. 1985, ch. 110, par. 13—202.) The plaintiff contends that the court erred because a fact question exists that can be resolved only by a trial.

The factual basis for the defendant's motion for summary judgment and for the court's ruling was the deposition of the plaintiff; and the following recitation of the facts is derived from that deposition.

She started using an intrauterine device (IUD), the Lippes Loop, in January of 1972. She had opted for using an IUD at that time because she had experienced either problems or poor results from other

---

*Justice Egan participated in this opinion prior to his assignment to the sixth division.

forms of contraception. She had two pregnancies aborted, the second one occurring when she was using a diaphragm and foam as a means of prevention. In July of 1972, her gynecologist, Dr. Klein, removed the Lippes Loop. Although she could not recall what prompted its removal, subsequent notations of Dr. Klein indicated that she was suffering from "acute pain from intrauterine device." She was successfully treated with antibiotics. The Lippes Loop was replaced with a Dalkon Shield, which was subsequently replaced by the defendant's CU-7 on about April 20, 1976. She had suffered vaginitis while using the Dalkon Shield. She had periodic check-ups with Dr. Klein while she was using the IUDs.

In early November 1977, she began to experience pain and other symptoms such as constipation and "bloatedness." When the symptoms continued, she went to the emergency room at Lutheran General Hospital. Test results proved negative. However, the staff at the hospital told the plaintiff they wanted her to see one of their gynecologists. She declined, stating that she would see her own gynecologist. After examining her, Dr. Klein immediately removed the IUD and scheduled her for surgery, because he could feel a giant mass. She said it was solely Dr. Klein's decision to remove the IUD. He explained that an IUD should not remain in the body when something else can be felt within the uterus.

Surgery was performed, and the mass was removed along with one fallopian tube and part of each ovary. It was her understanding that those organs were removed because they were infected, although she concluded that Dr. Klein did not tell her what caused the infection. She reached that conclusion because if Dr. Klein had told her the CU-7 might have been responsible for the infection, she never would have allowed him to place a second one in her body.

In December 1977 Dr. Klein inserted a second CU-7. She began to suffer from cramping sometime before March of 1978, and she believed the second IUD was removed during that month. The pain she experienced was less severe than that in 1977. Dr. Klein told her that her body was rejecting the IUD. Thereafter she requested a tubal ligation because she needed some form of birth control, she had either suffered problems with all of the forms used in the past, or worse, they had proved ineffective. She and Dr. Klein discussed the serious consequences of the tubal ligation before it was performed in April 1978. She had never had any problem finding the tail string of any of the IUD's she had used.

In September 1985, after reading newspaper coverage and seeing television reports of various lawsuits brought against IUD manufac-

turers, the plaintiff asked her new gynecologist, Dr. Jarolim, if the CU-7 might have caused the problems she experienced in 1977 and 1978. Dr. Jarolim's initial response was that he doubted a causal connection existed but that he would review the records of Dr. Klein, who had died. After Dr. Jarolim reviewed the records, he said that most probably an IUD had been responsible for the problems that resulted in the plaintiff's surgery and that he would testify to that conclusion. She then consulted an attorney.

■ The applicable law has been set out in two cases decided by the supreme court on the same day. In one case the court discussed the history of the rule governing the statute of limitations in medical malpractice cases (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869), and the other discussed the rule in strict liability cases (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864). Both cases make it clear that the rule applicable to both classes of cases is the same: The cause of action accrues when the plaintiff knows or reasonably should know of an injury *and* also knows or reasonably should know that the injury was wrongfully caused. *Witherell*, 85 Ill. 2d at 156; *Nolan*, 85 Ill. 2d at 169.

We agree with the defendant's interpretation of *Nolan* that the running of the statute is not tolled until the plaintiff knows or should know he has a cause of action against the defendant. The court so expressed itself. (85 Ill. 2d at 170.) But the court clarified its holding as follows (85 Ill. 2d at 171):

> "We hold, therefore, that when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed. In that way, an injured person is not held to a standard of knowing the inherently unknowable, [citation] yet once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights."

The *Nolan* court cited with approval *Wigginton v. Reichold Chemicals, Inc.* (1971), 133 Ill. App. 2d 776, 274 N.E.2d 118. That case involved a defective product, and the court made this pronouncement as to the applicable rule (133 Ill. App. 2d at 779-80):

> "In cases involving a disease resulting from neglect, negligence or a defective product we believe that the more logical and tenable position is that the cause of action accrues and the statute of limitation begins to run *when the diseased party discovered or should have discovered that he is ill as a result of*

*some neglect or negligence on the part of another party or as the result of being wrongfully exposed to a defective product."* (Emphasis added.)

■ We wish to emphasize that, contrary to the dissenting opinion's impression of our views, we do not mean to suggest that the statute is not triggered until the plaintiff gains actual knowledge of an actionable wrong or negligent conduct. The test in this case, therefore, is not whether the plaintiff should have known she had a cause of action against Searle in 1977 or 1978 but, rather, whether in 1977 or even 1978 she was possessed of knowledge that placed her under an obligation to inquire further to determine whether or not an actionable wrong had been committed, that is, that she had been exposed to a defective product.

■ The defendant argues that there are two rules applicable to medical malpractice and product liability cases, the "traumatic injury" rule and the discovery rule. There is but one rule, the discovery rule, as the very case cited by the defendant illustrates. In *Lutes v. Farley* (1983), 113 Ill. App. 3d 113, 115, 446 N.E.2d 866, the court said this: "Certainly, the stillbirth of a child is a sudden, traumatic event which should prompt some investigation by the injured party *and trigger the application of the discovery rule."* (Emphasis added.) And in *Pszenny v. General Electric Co.* (1985), 132 Ill. App. 3d 964, 478 N.E.2d 485, the appellate court held that the classification of an injury as "traumatic" or "non-traumatic" merely aids in the determination of when the plaintiff discovered, or should have discovered, that the injury was caused by wrongful conduct.

There is an abundance of cases involving summary judgment and the statute of limitations in medical malpractice and strict liability actions. Many of them are reversals of summary judgment orders. (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864; *McIntyre v. Christ Hospital* (1989), 181 Ill. App. 3d 76; *Peterson v. Loseff* (1987), 159 Ill. App. 3d 16, 512 N.E.2d 5; *Saunders v. Klungboonkrong* (1986), 150 Ill. App. 3d 56, 501 N.E.2d 882; *Paske v. Green* (1986), 142 Ill. App. 3d 367, 491 N.E.2d 1195; *Pszenny v. General Electric Co.* (1985), 132 Ill. App. 3d 964, 478 N.E.2d 485; *Lind v. Zekman* (1979), 77 Ill. App. 3d 432, 395 N.E.2d 964; *Martinez v. Rosenzweig* (1979), 70 Ill. App. 3d 155, 387 N.E.2d 1263; *Roper v. Markle* (1978), 59 Ill. App. 3d 706, 375 N.E.2d 934.) Other cases have upheld the grant of summary judgment. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869; *Barry v. G.D. Searle & Co.* (1974), 56 Ill. 2d 548, 309 N.E.2d 550; *Moore v. A.H. Robins Co.* (1988), 167 Ill. App. 3d 19, 520 N.E.2d 1007; *Lutes v. Farley* (1983), 113 Ill. App. 3d 113, 446

N.E.2d 866.) All differ factually from each other and from this case, but they provide some assistance in resolving the question before us. We shall discuss some of the cases; but, again contrary to the dissenting opinion's impression of our views, our discussion should not be construed to be an implication on our part that independent confirmation of the plaintiff's existing suspicion by others is necessary to activate the limitation period.

Particularly in point is *Martinez v. Rosenzweig* (1979), 70 Ill. App. 3d 155, 387 N.E.2d 1263. That case involved a suit for malpractice against a physician and a claim for strict liability against the manufacturer of an IUD. In 1973 the plaintiff's gynecologist, a defendant in the case, inserted an IUD into her uterus. Later that same year she became pregnant. When the plaintiff asked her doctor what had happened to the IUD, he said he was not sure but that most likely it fell out or that it would come out when the baby was born. The plaintiff assumed that the IUD had fallen out. The doctor continued to treat the plaintiff during the term of the pregnancy before the plaintiff's premature delivery of a stillborn fetus, but he never mentioned the IUD. The plaintiff continued to see the doctor and sought treatment for abdominal pains and severe discharges for almost two years. When the defendant could not diagnose what was prompting the severe pain, the plaintiff saw another gynecologist, who determined that a foreign object was in her abdomen and surgically removed the IUD.

The trial court granted the defendant's motion to dismiss on the ground that the action was untimely filed. The appellate court reversed, holding that the statute began to run against the doctor and the manufacturer at the same time, and made this observation (70 Ill. App. 3d at 161-62):

> "Thus, the pain and discharges could be symptomatic of many conditions. They could have been the result of many natural disorders, unrelated to the presence of the I.U.D. Dr. Rosenzweig, who was an expert in gynecology, treated her for the symptoms and failed to diagnose the true nature of the problem. He had told her that the I.U.D. had probably fallen out and had treated her for some period of time without discovering the I.U.D. It would appear reasonable that Mrs. Martinez did not know or have reason to know the nature of her problem when a gynecologist, who is a specialist in those matters, did not discover it."

At this juncture, we express disagreement with the statement of the trial court that the actions of Dr. Klein were "not relevant" against Searle. While the court did not reveal the basis of that remark, we conclude that it may have been certain language in *Witherell v.*

*Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869. We construe the language of the supreme court to mean that advice of a physician is not conclusive as to the manufacturer. It did not say such evidence was irrelevant. In *Lind v. Zekman* (1979), 77 Ill. App. 3d 432, 395 N.E.2d 964, the appellate court said if the physicians treating the plaintiff did not draw a causal connection between surgery and her blindness, it could not be said that the plaintiff's failure to suspect her physician of negligence was unreasonable. In *Wigginton v. Reichold Chemicals, Inc.* (1971), 133 Ill. App. 2d 776, 274 N.E.2d 118, a chemical exposure case, the court found significant, in the plaintiff's failure to discover the cause of his illness, the fact that even his doctor did not know the cause.

The very recent case of *McIntyre v. Christ Hospital* (1989), 181 Ill. App. 3d 76) involved a plaintiff who was six years old when the defendant performed surgical repair of a hernia previously diagnosed by the plaintiff's family physician. At all times before and after the surgery the plaintiff's testicles were undescended. From the time he entered high school he was aware that his condition was not like that of other boys. He thought his condition was attributable to the hernia surgery. When he was 20 years old, another doctor operated on him for kidney stones and noticed that he had undescended testicles. He informed the plaintiff, who alleged that this was his first knowledge that he had undescended testicles. That operating doctor swore in an affidavit that the defendant deviated from the appropriate standard of care by failing to detect the condition of undescended testicles in an examination following the surgery.

The trial court dismissed the complaint because the statute had expired two years after the plaintiff reached his eighteenth birthday. The appellate court reversed and rejected the defendant's argument that the plaintiff's awareness of the peculiar nature of his condition and his admission that he believed that the condition was caused by the hernia operation triggered the application of the statute as a matter of law. The court held that those aspects of the evidence were offset by the fact that his family physician told him that everything was fine after regular examinations and that after physical examinations at the Chicago Park District he was not told that anything was wrong.

Surely Searle would not argue that such evidence would be irrelevant if it could establish that Dr. Klein told the plaintiff he believed the IUD was defective. Indeed, some of the cases cited by Searle, which we will discuss later, placed considerable store on what physicians told their patients.

■ The question of when a party knew or reasonably should have

known both of an injury and its wrongful cause is one of fact, unless the facts are undisputed and only one conclusion may be drawn from them. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869.) These facts are undisputed, and the question is reduced to whether only one conclusion may be drawn from them.

The plaintiff in this case was in much the same position as the plaintiff in *Martinez v. Rosenzweig*. She was under the care of an expert in gynecology, and she relied on his advice and deferred to his superior knowledge. He informed her finally that her body was rejecting the IUD, an idiosyncratic reaction, with which even laymen are familiar in varying degrees. It is interesting to note that one of the defenses by Searle is that the injury was caused, not by a defect in the product, but by an idiosyncratic reaction. By no means are we saying that we assume that the plaintiff did in fact experience an idiosyncratic reaction as the dissent seems to suggest. If the evidence shows that the plaintiff's condition of ill-being was caused by such a reaction, that, of course, could well absolve the defendant from any liability; but, if the plaintiff did conclude that such a reaction caused her "rejection" of the IUD, a fact finder could conclude that her belief, even though mistaken, was not unreasonable.

■ For these reasons, we do not believe it can be said, as a matter of law, and as the trial court held, that the plaintiff "possessed sufficient information concerning her injury to require her to use due diligence to ascertain whether actionable conduct of Searle was involved." In our judgment reasonable persons could disagree on the question.

The defendant relies principally on two State cases that are distinguishable on their facts. *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869, included a claim against a physician for malpractice and against a manufacturer of a birth control pill. Both pleaded the statute of limitations.

The court dismissed both claims as a matter of law on the ground that they were not timely filed. The supreme court upheld the dismissal against the manufacturer and reversed as to the physician. In 1966 the defendant, Dr. Weimer, prescribed a birth control pill manufactured by the other defendant, Ortho-Novum. Shortly after she began taking the pill, the plaintiff suffered severe pain and spasms in her leg, which became so swollen she could hardly bear weight on it. She consulted with Dr. Weimer the following year. His associate, Dr. Taubert, hospitalized her and told her he thought she had a blood clot in her leg. Dr. Weimer, however, told her she had a muscle condition and would have to learn to live with it. She continued to have pain and

spasms, which progressively worsened, for five years. Dr. Weimer continued to treat her.

She was hospitalized by Dr. Weimer in 1972 and told him that she had heard from other women that birth control pills could cause blood clots. He "laughed" and said she should not worry, that the pills were safe and they would not harm her. She discontinued use of the pills for one month in 1973 at the urging of her mother but resumed taking them after Dr. Weimer again reassured her. She continued to see Dr. Weimer until 1976. During that three-year period Dr. Weimer told her it was a muscle condition and that there was nothing wrong with the veins in her legs.

In upholding the dismissal for lack of timeliness, the supreme court emphasized the fact that the plaintiff's mother and others had told her the pill could cause blood clots, that Dr. Taubert told her in 1967 and 1972 that she was having blood clots in her leg and that she knew there was a conflict between the diagnoses of the doctors. None of those facts, so damaging to the plaintiff's position, appears here.

In *Moore v. A.H. Robins Co.* (1988), 167 Ill. App. 3d 19, 520 N.E.2d 1007, the appellate court affirmed the trial court's dismissal of the complaint for lack of timeliness. The plaintiff had filed a complaint against her gynecologist and the IUD manufacturer 11 years after the Dalkon Shield was inserted into her uterus and approximately 10 years after its removal. Like this case, the plaintiff was prompted to begin her investigation after viewing a television report outlining the effects of the Dalkon Shield.

The defendant gynecologist had inserted an IUD in June 1974. Thereafter the plaintiff developed pain and an infection. During each visit to the doctor concerning her ailments, she inquired as to the reason for the pain and infection, and the doctor told her not to worry about it. Sometime in 1975 he told her the IUD had to be removed. He identified it as a Dalkon Shield. She repeatedly asked why the removal was necessary. *"He refused to explain"* and said only, "Do not worry about it, when the infection clears up, we can insert an *improved* I.U.D." *Moore*, 167 Ill. App. 3d at 22. (Emphasis added.)

In late 1975 or early 1976 he told her that she was pregnant and that the fetus had died *in utero*, requiring a dilatation and curettage, which was performed in March 1976. Approximately one month after the surgery, the defendant's associate told her she was not pregnant at the time the procedure was performed. She had learned in May 1975 that she had parametritis secondary to her IUD. The doctor never told her that the parametritis necessitated the dilatation and curettage or that the IUD was the source of her physical problems. The trial judge,

in dismissal, emphasized the fact that the plaintiff had received conflicting information from the defendant and his associate.

The appeal involved only the complaint against the doctor and not the manufacturer. Her claim against the doctor was based on her allegation that he inserted the Dalkon Shield knowing it to be dangerous. The appellate court noted that the plaintiff's medical records demonstrated that she was pregnant in early 1976 and that she had an infection secondary to her IUD in May 1975. The court concluded, therefore, that her allegation that the defendant told her she was pregnant in order to conceal the true reason for the dilatation and curettage was "meritless."

In affirming the order of dismissal, the court stressed these uncontradicted facts in support: the plaintiff experienced pain and infection following the insertion of the IUD and those difficulties ceased after the IUD was removed; the defendant's statements indicated *that the source of the infection was the IUD*; and one month after the dilatation and curettage the defendant's associate told the plaintiff that the dilatation and curettage was not prompted by her pregnancy. The court concluded that those facts were sufficient to put a reasonable person on notice that the defendant's treatment might have been the source of her physical complications. Factually, the *Moore* case is wide of the mark in this case. Dr. Klein did not ignore repeated requests by the plaintiff and never "refused to explain" why the IUD should be removed; he never told the plaintiff that the IUD was the source of the infection; he never mentioned inserting an *improved* IUD, which would imply to any reasonable person that something was wrong with the first one; and he certainly was not contradicted by any other doctor or anyone else.

The defendant has also cited three Federal court of appeals decisions, which are also factually distinguishable.

In *Miller v. A.H. Robins Co.* (7th Cir. 1985), 766 F.2d 1102, the plaintiff filed an affidavit in which she said she had been hospitalized in 1974 for symptoms consistent with an infection but was not advised by her physicians that there was any connection between the illness and injury and her use of a Dalkon Shield. However, in her deposition she testified that her physician told her that the Dalkon Shield was irritating her treatment and that it was a possible source of her infection. The court of appeals held that the deposition controlled.

In *Curry v. A.H. Robins Co.* (7th Cir. 1985), 775 F.2d 212, the plaintiff developed severe menstrual irregularity and increasing pain. Her doctor was unable to locate the tail string on the IUD, and an operation was required to remove it. There are two facts present in

that case that are absent here. First, there was obviously something wrong with the IUD. Second, and most damaging, as the court emphasized, the plaintiff conceded in her brief and in argument that "she was aware of the relationship between her medical problems and the I.U.D." at the time of her operation.

In *Sellers v. A.H. Robins Co.* (11th Cir. 1983), 715 F.2d 1559, the court pointed out that Alabama was not a "discovery" State for purposes of medical malpractice cases. Only fraudulent concealment would toll the running of the statute. The court simply held that the record failed to establish fraudulent concealment on the part of the manufacturer. We note parenthetically that although the court of appeals affirmed the trial court's dismissal, it subsequently granted a rehearing. (*Sellers v. A.H. Robins Co.* (11th Cir. 1984), 732 F.2d 129.) That case does not address the issue in this case.

The defendant also argues that it will be prejudiced by the difficulties in proof that have occurred because of the passage of seven years between the occurrence and the filing of the complaint. This argument is based primarily on the result of the death of Dr. Klein and the plaintiff's own fading memory. The fact is, however, that the legislature has seen fit to permit the filing of some complaints in products liability cases within 12 years of the date of the first sale by the manufacturer or 10 years from the date of the first possession by the purchaser, and this case is within the limits of the statute.

■ After considering the plaintiff's argument, we are convinced that the absence of Dr. Klein redounds in favor of the defendant rather than the plaintiff. His medical records still exist and were used by the defendant in support of its argument here. Further, the defendant has advanced the additional argument that Dr. Klein knew of the risks involved in the CU-7 and was "aware of a possible connection between her symptoms and the I.U.D."; in other words, that Dr. Klein, knowing that the IUD might be defective, still prescribed it for the plaintiff after considering all of the risks and benefits. This is an argument that the defendant may well advance at trial, and it will be the plaintiff who will be prejudiced by the absence of Dr. Klein, who will not be able to defend himself against so grim a charge.

■ The right of a moving party for a summary judgment must be clear and free from doubt. (*Lind v. Zekman* (1979), 77 Ill. App. 3d 432, 395 N.E.2d 964.) Since, in our judgment, the record in this case raises a question of fact as to when the plaintiff possessed sufficient information concerning her injury to require her to use due diligence to ascertain whether actionable conduct of the defendant was involved, the summary judgment was improperly granted. Therefore, we remand

58

the case for further proceedings consistent with this opinion.

Judgment reversed and remanded.

SCARIANO, J., concurs.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE EGAN delivered the supplemental opinion upon denial of rehearing:

■■ In the petition for rehearing the defendant maintains that the majority "appears" to have misconstrued the applicable law based on our discussion of *Wigginton v. Reichold.* It argues that the majority has held that the statute begins to run when the plaintiff discovered or should have discovered that her injury was caused by being exposed to a defective product. We thought that our opinion made our holding clear, but we will repeat the pertinent parts in an attempt to do so here.

We pointed out that the court in *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171, 421 N.E.2d 864, clarified its position as to the running of the statute:

"[T]he statute begins to run *and the party is under an obligation to inquire further* to determine whether an actionable wrong was committed." (Emphasis added.)

We also said the following:

"The test in this case, therefore, is not whether the plaintiff should have known she had a cause of action against Searle in 1977 or 1978 but, rather, whether in 1977 or even 1978 *she was possessed of knowledge that placed her under an obligation to inquire further* to determine whether or not an actionable wrong had been committed, that is, that she had been exposed to a defective product." (Emphasis added.) 182 Ill. App. 3d at 51.

"[W]e do not believe it can be said, as a matter of law, and as the trial court held, that the plaintiff *'possessed sufficient information concerning her injury to require her to use diligence to ascertain* whether actionable conduct of Searle was involved.' In our judgment reasonable persons could disagree on the question." (Emphasis added.) (182 Ill. App. 3d at 54.)

[T]he record in this case raises a question of fact as to *when the plaintiff possessed sufficient information concerning her injury to require her to use due diligence* to ascertain whether ac-

tionable conduct of the defendant was involved." (Emphasis added.) 182 Ill. App. 3d at 57.

The defendant also maintains that the majority "implies" that it was required that Dr. Klein tell the plaintiff that "he believed the IUD was defective." We imply nothing of the sort. We thought the opinion made that clear also:

"[O]ur discussion should not be construed to be an implication on our part that independent confirmation of the plaintiff's existing suspicion by others is necessary to activate the limitation period." 182 Ill. App. 3d at 52.

The defendant argues that our analysis is inappropriate because it conflicts with substantive tort law governing prescription drugs. In support, it points out that the CU-7 Intrauterine Copper Coil has been classified and approved by the Food and Drug Administration as a prescription drug, and that under Illinois law, a prescription drug is not considered defective or unreasonably dangerous merely because it is associated with risk or causes injury; but only if sold without adequate warnings of risks that are known or should have been known to the manufacturer. Apart from the fact that this is an argument never advanced before, we reject it because it is a matter of defense to the plaintiff's complaint. We point out that, for the purposes of the motion to dismiss, the allegations that the CU-7 was defectively designed were admitted.

■■ Last, the petitioner contends that the majority opinion "assumes" that Dr. Klein did not know of any possible causal connection between the plaintiff's injuries and the IUD. The defendant argues at great length to refute that "assumption." Our answer is that we made no such assumption, as the majority opinion should illustrate. We pointed out that the defendant had argued that Dr. Klein, at the time he prescribed the IUD, knew of the risks and was aware of a possible connection between the plaintiff's symptoms and the IUD. In response to that argument, we said that that was "an argument that the defendant may well advance at trial." (182 Ill. App. 3d at 57.) That statement in the opinion cannot be reconciled with an alleged "assumption" on our part that Dr. Klein did not know of any possible causal connection between that plaintiff's injuries and the IUD.

SCARIANO, J., concurs.

JUSTICE HARTMAN, dissenting:

Respectfully, I am compelled to dissent. I agree that the phrase "reasonably should know *** [an injury] was wrongfully caused" may

be restated as "possessed of sufficient information concerning [the] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 416, 430 N.E.2d 976; *Moore v. A.H. Robins Co.* (1988), 167 Ill. App. 3d 19, 23, 520 N.E.2d 1007.) The result reached by the majority, however, neglects this principle and suggests instead that the statute of limitations is not triggered until plaintiff gains actual knowledge of an actionable wrong or negligent conduct. Furthermore, the majority may not intend that such an inference be drawn; nevertheless, the discussion of *Martinez v. Rozenweig* (1979), 70 Ill. App. 3d 155, 387 N.E.2d 1263, *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869, *Wigginton v. Reichold Chemicals, Inc.* (1971), 133 Ill. App. 2d 776, 274 N.E.2d 118, and *Moore* will lead readers of this opinion to believe that independent confirmation of plaintiff's existing suspicions, be it by the media or third persons, is somehow necessary to activate the limitations period. I do not believe that such requirement exists in the case law. It is enough, rather, that plaintiff *alone* possess sufficient facts to place a reasonable person on inquiry.

In the case *sub judice*, plaintiff's deposition testimony demonstrated she suffered incapacitating pain, bloating and constipation within 20 months of insertion of the first CU-7 device in April 1976. This episode was followed immediately by surgery to remove a "giant mass," part of an ovary and one fallopian tube. Four months after insertion of a second CU-7 in December 1977, plaintiff consented to removal of the device after again experiencing "very bad cramping" and "lower abdominal pain," although admittedly not of the same severity as occurred in 1977. Significantly, Dr. Klein informed plaintiff in March 1978 that plaintiff's body was "rejecting" the IUD and that it "couldn't take another IUD." Plaintiff herself "knew" in 1978 she could not physically withstand the insertion of another IUD, stating at her deposition, "I could figure that out for myself," and "[A] foreign substance was causing me pain at this time. I was able to determine that another foreign substance might do the same." Although the events of 1977 might not alone have actuated the statute of limitations, plaintiff had by March 1978 endured two incidents of similar symptoms associated with the insertion of the CU-7. Her statements regarding her inability to tolerate another IUD demonstrate without doubt that she already had acquired sufficient facts of a possible link between the CU-7 and her alleged injury, reasonably placing upon her the burden to inquire further.

Moreover, the majority minimizes the significance of Dr. Klein's statement that plaintiff's body "rejected" the IUD as evidence of an

"idiosyncratic reaction, with which even laymen are familiar in varying degrees." (182 Ill. App. 3d at 54.) This contention, however, assumes a legal result not yet proved and is, in any event, irrelevant: the motion for summary judgment at bar inquires only whether facts existed to reasonably require investigation by plaintiff, not whether those facts ultimately demonstrate a physical reaction unique to plaintiff alone.

If *Moore v. A.H. Robins Co.* is "wide of the mark in this case," as the majority suggests (182 Ill. App. 3d at 56), it is only because the facts in the present case more strongly favor defendant. Admittedly no "contradictory statements" from the defendant physician were made here, as they were in *Moore*, but Dr. Klein clearly and directly advised plaintiff in 1978 that her body was "rejecting" the IUD and that her body "couldn't take another." Based upon the preceding episodes in 1977 and early 1978 involving the IUD, a reasonable person should have begun to inquire in 1978, following the doctor's comments to her, as to why she was sustaining these substantial symptoms and injuries and was caused to undergo the operation.

Recently, we have decided *McIntyre v. Christ Hospital* (1989), 181 Ill. App. 3d 76, in which we held that summary judgment was improperly entered against a plaintiff who possessed undescended testicles apparently from birth, but attributed the absence of testicles to a hernia operation performed on him by the defendant surgeon at age six. After age six, he underwent a series of physical examinations and was constantly assured by his family physician performing those examinations that "everything [was] fine." Although he noticed the absence of a mass in his testicular region, he never was told that anything was wrong by his family physician or his employer's physician who administered employment examinations for several years. The first intimation he received of possible wrongdoing came after surgical removal of a kidney stone at age 20, when that surgeon advised him that surgery for the purpose of lowering his testicles should have been performed at the time of his hernia operation when he was age six. We held there that summary judgment in favor of defendant hernia surgeon under those facts was erroneous and remanded the cause for a determination by the fact finder as to whether McIntyre possessed sufficient information to put a reasonable person on inquiry as to wrongdoing. These facts, in my opinion, are in stark contrast to the facts of the instant case which demonstrate that Mrs. Ravin herself "knew" in 1978 that she was unable to withstand physically the insertion of another IUD and "could figure that out" for herself.

Accordingly, I would affirm the decision of the circuit court in this case.