JOSEPHINE MELKO, Plaintiff-Appellant, v. RAY M. DIONISIO, Defendant-Appellee.

Second District No. 2—91—0168

Opinion filed October 9, 1991.

R.S. Maione, of Chicago, for appellant.

Stephen J. Thompson, of Stamos Trucco, of Chicago, for appellee.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, Josephine Melko, appeals a trial court order dismissing her complaint for common-law fraud against defendant, Ray M. Dionisio. Plaintiff alleged that defendant engaged in a scheme to defraud her by selling her corporate notes that he misrepresented as "CDs." Defendant moved pursuant to section 2—619(a)(5) of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—619(a)(5)) to dismiss the complaint as barred by the five-year statute of limitations for fraud (Ill. Rev. Stat. 1989, ch. 110, par. 13—205). The trial court granted the motion and denied plaintiff's motion to reconsider and to grant leave to amend the complaint to include a claim for breach of contract.

On appeal, plaintiff argues that (1) the trial court erred in holding that, as a matter of law, the complaint was time barred, as plaintiff raised a factual issue of when she was on notice of the alleged fraud; and (2) the trial court abused its discretion in not allowing her to

amend her complaint, as her allegation that defendant dominated the corporation with whom she contracted was sufficient to bind defendant personally. We reject both contentions and affirm.

On January 31, 1990, plaintiff filed her original complaint against defendant and Consumer Systems Corporation (CSC), alleging on information and belief that defendant was president and owner of a controlling interest in CSC. The complaint then made the following allegations. On or about 1981, defendant approached plaintiff, seeking to interest her in lending money to CSC. Plaintiff's funds were then invested only in bank certificates of deposit (CDs), and she told defendant that she was interested only in investing in CDs. Defendant represented to plaintiff that she would be investing in CDs and gave her a written summary of available investments with their maturities and rates of return. A copy of this summary is attached to the complaint and includes the handwritten heading "CORPORATE NOTES OR C.D.'S."

Based on defendant's written and oral representations that the proposed investment was a "CD," plaintiff invested $10,000, which defendant promptly repaid in November 1981 along with interest of $1,500 as promised. Along with the interest and principal, he sent her a letter, dated November 10, 1981, with the heading "CORPORATE NOTE/CD SUBSCRIPTION." In the letter, defendant, on behalf of CSC, thanked plaintiff for her participation and informed her that the company would let her know of any future investment opportunities. Plaintiff attached a copy of this letter to the complaint.

Having obtained plaintiff's confidence, defendant then induced her to make a further investment of $50,000, representing that the corporate notes were "CDs." To retain plaintiff's confidence, defendant subsequently paid plaintiff further sums amounting to about $3,000 and thereafter assured plaintiff that temporary obstacles held up payment on her "CDs." Defendant induced plaintiff to change the form of her investment, telling her that her "CDs" were safe even after CSC became bankrupt, that the various changes were "mere formalities" and that her money would be repaid.

The complaint alleged that "in recent times" plaintiff learned that she had been duped by defendant, whose misrepresentations as to her "CDs" and their repayment were steps in his scheme to defraud her. The complaint prayed for compensatory and punitive damages.

After plaintiff took a voluntary nonsuit against CSC, defendant moved to dismiss the complaint. Defendant argued that because plaintiff alleged fraud in connection with certain investments she made be-

tween 1982 and 1984, her complaint was filed outside of the five-year statute of limitations.

Defendant included a statement of facts, later verified by affidavit. Defendant alleged the following facts. On January 8, 1982, plaintiff purchased a $10,000 note from CSC, identified as "Short-Term Corporate Note No. 8." Neither party could locate a copy of the note. Plaintiff received monthly interest checks on the note. When it matured on June 1, 1982, plaintiff reinvested the money in a similar corporate note, also denominated as "Note No. 8." The note, a copy of which is attached to defendant's motion, identifies the obligation as "SHORT-TERM CORPORATE NOTE" and does not use the term "Certificate of Deposit." The note also states in capital letters that the securities represented therein had not been registered under the Federal act of 1933 and states in small letters that "this Note is the obligation of CSC only." Plaintiff received $58.24 interest on this note on June 15, 1982. On that date she rolled over this note into a long-term note, maturing on August 15, 1983. She invested an additional $30,000 and signed a note, identified again as Note No. 8, for this new $40,000 investment; the note, a copy of which defendant attached to his motion to dismiss, was similar in form and language to the note of June 1, 1982. As per the terms of the note, plaintiff received a "front end payment" of $2,000 on June 15, 1982, and, between June 15, 1982, and August 15, 1983, received 13 interest checks aggregating $6,500. Defendant attached CSC's records of these payments to his motion to dismiss.

On August 11, 1983, plaintiff renewed her $40,000 note for one year at 14% interest. The new note was denominated "Note No. 8A" and was similar in language and form to the previous notes. Attached to defendant's motion are corporate records evidencing plaintiff's receipt, between September 13, 1983, and June 15, 1984, of 10 monthly interest payments of $466.67 each.

In the latter half of 1983, CSC prepared to undertake an "initial public offering" of securities to the general public. Part of the preparation included securing a $1.8 million credit line from Continental Illinois Bank (Continental). Also, CSC was required to inform present noteholders that their notes were not in technical compliance with Illinois law and to give the noteholders an opportunity to rescind the outstanding notes. Plaintiff therefore received a letter dated November 19, 1983, from CSC's controller, Edgar Dionisio, informing her that the sale of Note 8A was voidable at her option because CSC had "failed to file a certain form with the Secretary of State" as required by the Illinois Securities Act of 1953. The letter gave plaintiff 15 days

in which to accept CSC's offer to rescind the sale; if plaintiff did so, CSC would repay her principal plus remaining interest and would release her from any contractual obligations to CSC she undertook in connection with the sale.

Plaintiff did not accept the offer, but on April 19, 1984, signed a new short-term corporate note, maturing on July 19, 1984, for $10,000 and $400 interest. The note was similar in language and form to plaintiff's earlier notes.

On June 27, 1984, Continental, in the early stages of its well-publicized financial crisis, threatened to call the CSC loan and demanded, among other things, that CSC obtain the consent of its noteholders to subordinate their notes to Continental's loan. On July 3, 1984, defendant, at the direction of Continental, informed plaintiff and other noteholders by letter that Continental demanded that the noteholders agree to subordinate their interests to that of Continental for an undetermined amount of time and that CSC freeze interest payments. The letter stated that if CSC did not meet these conditions, Continental would refuse to assist CSC, "the Company cannot continue to operate and the Noteholders would stand to lose their investment." Plaintiff signed her copy of the four-page subordination agreement on July 14, 1984.

According to defendant's motion to dismiss, plaintiff some time in October 1984 converted $25,000 of her note obligations to CSC common stock, signing a disclosure acknowledgment letter. Defendant attached a copy of an acknowledgment letter to his motion to dismiss; this copy, however, was signed by another investor, not plaintiff. The letter states that the investor was purchasing the shares with full knowledge that CSC was technically insolvent; that it was delinquent in its taxes and operating under a Federal tax lien; and that the outstanding loan with Continental was in jeopardy "due to covenant violations." The letter also stated:

> "With full knowledge of the above facts, I willingly make this investment with the realization that my investment may not appreciate and indeed that unless the status of the Corporation changes, my entire investment is at risk and may be lost. Further, I understand that I have access to any and all additional information regarding the Corporation. I have also discussed this investment with my own professional counselors."

Although the record contains no such letter signed by plaintiff, defendant did attach, with his response to plaintiff's motion to reconsider the dismissal, a copy of a form, on CSC stationery, signed by plaintiff and defendant on October 16, 1984. Plaintiff stated therein

that on October 16, 1984, she indicated her intention to invest in CSC common stock by signing a letter of intent; that since that time she had "either personally or through [her] advisors carefully examined all of the data then given to [her] and made such other inquiries as [she] considered necessary to satisfy [herself] about this investment." The letter also stated, "I recognize that this investment involves a high degree of risk and is best described as speculative in nature. I represent to you that I can afford the loss of this investment."

On November 9, 1984, CSC also sent plaintiff a copy of her revised Note 8A, which now represented an obligation of $25,000 principal plus $5,061.76 interest, maturing on October 29, 1985. The note was similar in form and language to plaintiff's previous notes.

CSC was forced into bankruptcy on February 25, 1985. On May 6, 1985, CSC filed a voluntary petition for reorganization under chapter 11 of the Federal Bankruptcy Code. The Federal bankruptcy court notified plaintiff and other creditors of CSC of their right to file claims at a creditors' meeting to be held June 13, 1985. Plaintiff did not file any claim in the proceeding. Plaintiff also received a copy of CSC's reorganization plan, under which noteholders including plaintiff would receive, as full satisfaction of their claims, preferred shares with an aggregate par value of 12% of their claims, cash dividends on this stock from January 1, 1995, through January 1, 2000, and the right thereafter to convert their shares to common stock with a value equal to 88% of their respective allowed claims. Plaintiff voted to accept the plan, the bankruptcy court approved the plan, and on May 24, 1989, CSC was discharged from bankruptcy.

In moving to dismiss the complaint, defendant argued that the five-year statute of limitations (Ill. Rev. Stat. 1989, ch. 110, par. 13—205) required plaintiff to file her suit within five years of the time that she knew or should have known of defendant's alleged fraud; that by 1984 at the latest, plaintiff was aware of all of the facts needed to discover the alleged fraud; that although plaintiff alleged that defendant misled her into believing that the notes were "CDs" rather than corporate notes, the notes themselves and the November 1983 rescission letter clearly informed her that the instruments were corporate notes and solely the obligation of CSC; and that the correspondence and documents regarding the subordination of plaintiff's note to the Continental loan and the partial conversion of plaintiff's note to a speculative investment in CSC stock again put plaintiff on notice that her investment was not what she alleged that she originally believed it was. Defendant also argued that his correspondence with plaintiff negated any argument that he fraudulently concealed

plaintiff's cause of action from her; she could not therefore argue that the statute of limitations had been tolled under section 13—215 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 13—215).

In response, plaintiff argued that defendant was a fiduciary of plaintiff and that the documentation that he provided her was irrelevant to the limitations issue because defendant's domination of plaintiff enabled him to deceive her by representing to her that these various documents were formalities and that he would eventually pay her. Therefore, argued plaintiff, her suit was timely because she discovered the fraud in 1989, after her rights expired in the bankruptcy proceeding and defendant told her that he would not pay her.

Plaintiff supported her response with a statement of facts verified by affidavit. She stated that she and her bedridden husband resided in a lower middle-class Chicago neighborhood. They lived on her husband's pension and their savings; their savings were invested only in certificates of deposit.

Plaintiff's daughter worked for CSC and introduced her to defendant, who later called plaintiff to interest her in investing in CSC. After plaintiff told defendant that her and her husband's savings were invested in a CD, defendant represented his investment as a "CD." Plaintiff invested in the "CD," and defendant promptly paid the principal and interest upon maturity. However, at defendant's request, plaintiff immediately reinvested the money. When plaintiff's husband received a disability award, defendant successfully solicited her for that money and always told her that the notes and stock were "CDs."

Plaintiff alleged further that when CSC suspended interest payments on the notes, defendant assured her that the matter was a "formality" and that the "CDs" were safe. Defendant also induced her to ignore the November 1983 rescission letter by telling her that it was a "formality." When CSC filed for bankruptcy, defendant assured her that when the company was out of bankruptcy (to quote the statement of facts), "she would be paid in full plus interest." When, in 1989, she discovered that the approved bankruptcy plan provided for only partial payment of her interest, he told her that the bankruptcy court forbade him to pay her, but that when the company was out of bankruptcy, he would pay her in full. When CSC emerged from bankruptcy, plaintiff asked for her money, but defendant refused and told her that he had no money to pay her. Defendant later told plaintiff's daughter that he was making money "hand over fist." Plaintiff's daughter refused defendant's invitation to go to Hawaii with him.

After hearing arguments, the trial judge granted defendant's motion to dismiss. Plaintiff then filed a motion to reconsider and to amend the complaint. The proposed amendment added a count for breach of contract in which plaintiff, in addition to incorporating the original complaint insofar as relevant, alleged that defendant executed a written undertaking to issue plaintiff "CDs" of CSC; that defendant at all relevant times owned or substantially controlled the equity of CSC, making the corporation defendant's alter ego and therefore making the corporation's obligation defendant's personal obligation; and that defendant refused to pay plaintiff for her "CDs" even though plaintiff had performed all of her obligations under the contract. As evidence of this written obligation, plaintiff incorporated by reference the exhibits from her original complaint. The trial court denied plaintiff's motion, and she now appeals.

Plaintiff argues first that the trial court erred in holding that her claim for fraud was barred by the five-year statute of limitations. She contends that because defendant was her fiduciary (or at least because she raised a factual question on that issue), she was not obliged to inquire into the facts that might have put her on notice that she had a cause of action, but was entitled to rely on defendant's assurances that she was purchasing "CDs" and that the "CDs" were safe. Because of defendant's fraudulent concealment of her cause of action, she concludes, the statute of limitations did not begin to run until she actually discovered the fraud in 1989, and her suit was timely brought.

We disagree. Even granting the existence of a fiduciary relationship, the evidence before the trial court establishes that, more than five years before she filed her complaint, plaintiff had actual information sufficient to put her on notice of any alleged fraud. Given this actual knowledge, plaintiff could not invoke fraudulent concealment to extend the statute of limitations.

■ Section 2—619(a)(5) of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—619(a)(5)) enables a defendant to move for involuntary dismissal based on the statute of limitations. The purpose of section 2—619 is to provide a means to dispose of issues of law or of easily proved issues of fact. (*Bloomingdale State Bank v. Woodland Sales Co.* (1989), 186 Ill. App. 3d 227, 232.) A motion under section 2—619 admits well-pleaded facts alleged in the complaint, but not conclusions of law or conclusions of fact unsupported by specific factual allegations. (*Willis v. Ohio Casualty Co.* (1981), 101 Ill. App. 3d 1099, 1105.) A motion to dismiss pursuant to section 2—619 should not be granted if material facts are controverted, and in ruling upon the mo-

tion the trial court may not weigh the evidence. *Marvel Engineering Co. v. Matson, Driscoll & D'Amico* (1986), 150 Ill. App. 3d 787, 796.

■ As the parties agree, this action for common-law fraud is governed by the five-year statute of limitations (Ill. Rev. Stat. 1989, ch. 110, par. 13—205; *Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 560). The limitations period begins to run when the plaintiff knows or reasonably should know that an injury has occurred and that it was wrongfully caused. (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 415-16.) This is the point where the injured party possesses information sufficient to put a reasonable person on inquiry to determine whether actionable conduct is involved. (*Knox College*, 88 Ill. 2d at 416.) When the limitations period commences in a given case is ordinarily a question of fact unless only one conclusion may be drawn from undisputed facts. *Janetis v. Christensen* (1990), 200 Ill. App. 3d 581, 586.

■ Section 13—215 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 13—215) provides additionally that "[i]f a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such a cause of action."

■ The sheer vagueness of plaintiff's complaint and subsequent argument, at both the trial and appellate levels, does not ease our consideration of her appeal. The gist of the complaint is that defendant schemed to defraud plaintiff by inducing her to invest money that he did not intend to pay back. However, plaintiff's argument on appeal centers not on the allegation that defendant never intended to pay back the money, but on her assertion that defendant misled her about the type and quality of her investment. As defendant has not challenged the sufficiency of the complaint, we choose not to dwell on the deficiencies of plaintiff's allegations except insofar as they are relevant to the particular issues on appeal. In discussing these issues, we may consider not only the complaint but the well-pleaded allegations of the verified fact statement that plaintiff made in response to the affirmative defense. See *Senior Housing, Inc. v. Nakawatase, Rutkowski, Wyns & Yi, Inc.* (1989), 192 Ill. App. 3d 766, 771; *Fourdyce v. Bay View Fish Co.* (1982), 111 Ill. App. 3d 76, 80.

The investments in "CDs" upon which plaintiff focuses were complete by 1984. As plaintiff's brief characterizes the actionable fraud in this case as the sale of the "CDs," we may conclude that she argues only that defendant's post-1984 alleged misrepresentations are material to the issue of when the limitations period started to run; that is,

we do not understand plaintiff to assert that any of defendant's actions after 1984 were essential elements of her actionable injury itself.

■ Absent any fiduciary relationship, there can be no doubt at all that plaintiff knew or should have known facts sufficient to put her on inquiry more than five years before she filed her complaint. By the end of 1984, she had ample evidence that her investments were not what she allegedly had assumed they were. Indeed, it may be that she was charged with such knowledge at the outset. A "certificate of deposit" is a written acknowledgment by a bank of a receipt of money with an engagement to repay it. (Ill. Rev. Stat. 1989, ch. 26, par. 3—104(2)(c); see Black's Law Dictionary 205 (5th ed. 1979).) The distinction between the safe "CDs" that plaintiff alleges she thought she was getting and the "CDs" that defendant sold her is that the former are issued by banks while the latter were issued by the defendant's closely held corporation. This difference is of course significant, but it was never hidden from plaintiff; from the outset, she was aware that she was lending money to the corporation for which her daughter worked and not to an insured financial institution.

In any event, by the end of 1984 plaintiff was definitely on notice that something was suspiciously awry. She had received and in some cases signed documents stating that (1) her investments were corporate notes that were solely the obligation of CSC; (2) interest payments on the notes would be suspended because of pressure from Continental; (3) her investment was being changed from $50,000 in notes to $25,000 in notes and $25,000 in common stock; and (4) this purchase of common stock was a risky and speculative investment in a technically insolvent corporation. Moreover, defendant had not paid her interest on her note since July.

At least absent a fiduciary relationship with defendant, plaintiff was, under such circumstances, obligated to make reasonable investigations consisting, at a minimum, of reading the documents themselves. (*Belleville National Bank v. Rose* (1983), 119 Ill. App. 3d 56, 59.) Even assuming that she read none of what she was signing, plaintiff was aware by late 1984 that defendant had stopped paying her interest and that half of her investment in "CDs" had been converted into stock.

■ Plaintiff invokes the rule that one who intentionally misrepresents the facts, knowing that another person will thereby be induced to act, may not later evade liability by claiming that the other person failed to discover the misrepresentation. (*Farmer City State Bank v. Guingrich* (1985), 139 Ill. App. 3d 416, 426.) She argues that defend-

ant may not point to her failure to investigate, as his own false representations that her money was safe regardless of various "formalities" induced plaintiff not to investigate. However, the rule cited by plaintiff is qualified. Plaintiff must show that her reliance was reasonable; otherwise, the duty of inquiry is not suspended. (*Guingrich*, 139 Ill. App. 3d at 426; see *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.* (7th Cir. 1990), 896 F.2d 1035, 1041-43.) Plaintiff has not met this burden, as the facts known to her by late 1984 were such as to make defendant's assurances inherently suspect. Moreover, plaintiff's allegations of such assurances are made with so little specificity that we cannot necessarily infer that defendant made them with the intent to mislead her or defraud her.

■ We cannot agree with plaintiff that defendant's alleged assurances that the various documents she signed were "formalities" and that she would eventually be paid constitute fraudulent concealment. Plaintiff had the burden to allege facts that affirmatively showed such fraudulent concealment of her cause of action. (*Pratt v. Sears Roebuck & Co.* (1979), 71 Ill. App. 3d 825, 830.) Fraudulent concealment ordinarily requires affirmative acts or representations designed to prevent discovery of the cause of action. (*Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 561.) Moreover, the plaintiff must show that these acts did in fact prevent discovery of the cause of action. *McDaniel v. La Salle Ambulance Service, Inc.* (1982), 108 Ill. App. 3d 1042, 1045; *Zagar v. Health & Hospitals Governing Comm'n* (1980), 83 Ill. App. 3d 894, 898.

■ The instances of fraudulent concealment are alleged without enough specificity to inform us whether they were in fact false representations or whether the intent to defraud is necessarily or probably inferable from them. (See *Board of Education of City of Chicago v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 457.) Assuming *arguendo* that plaintiff has adequately alleged such affirmative representations, she has not demonstrated that they did in fact prevent the discovery of the action. As we have explained, plaintiff by the end of 1984 had actual information that imposed upon her a duty of inquiry. Where such actual information is available, a plaintiff must take heed of it even though the defendant makes representations to the contrary. *Skrodzki v. Sherman State Bank* (1932), 348 Ill. 403; *Gadsby v. Health Insurance Administration, Inc.* (1988), 168 Ill. App. 3d 460, 473; *Luciani v. Bestor* (1982), 106 Ill. App. 3d 878, 888.

Plaintiff argues, however, that because defendant was her fiduciary, she was not obligated to use ordinary diligence in inquiring into whether she had suffered an actionable wrong. Therefore, she rea-

sons, the statute of limitations began to run only in 1989, when she actually discovered defendant's fraud. We cannot agree.

■ Plaintiff is correct that where a fiduciary has a duty to disclose certain facts to the plaintiff but fails to do so, the plaintiff's failure to use diligence to ascertain these facts is excused, and the statute of limitations begins to run when the plaintiff actually discovers the fraud. (*Prueter v. Bork* (1981), 105 Ill. App. 3d 1003, 1006.) A fiduciary relationship may excuse a party from the obligation to read a document that she has signed. (*Prueter*, 105 Ill. App. 3d at 1007; *Melvin State Bank v. Crowe* (1968), 97 Ill. App. 2d 82.) Furthermore, in a confidential or fiduciary relationship, the dominant party's silence alone may constitute fraudulent concealment. *Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 562.

Although plaintiff does not maintain that as a matter of law a debtor and creditor stand in a fiduciary relationship, a position for which we are aware of no support, she argues that defendant made himself a fiduciary of plaintiff under the facts of this case when he obtained her confidence after repaying her on her initial "CD" in 1982. Plaintiff points to the parties' unequal levels of financial sophistication, to her reliance on defendant's advice and representations, and to defendant's aggressive role in soliciting her business.

■ In addition to categories of relations where fiduciary duties exist as a matter of law, the concept has also been held broadly applicable to relationships in which trust is reposed on one side and there is a resulting influence and superiority on the other side. (*De Witt County Public Building Comm'n v. County of De Witt* (1984), 128 Ill. App. 3d 11, 26; *Melvin State Bank v. Crowe* (1968), 97 Ill. App. 2d 82, 97-98.) Important factors to consider in determining whether a fiduciary relationship exists in fact include the degree of kinship, disparity of age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly subservient party entrusted the handling of her business affairs to the other and reposed faith and confidence in him. *Farmer City State Bank v. Guingrich* (1985), 139 Ill. App. 3d 416.

■ Although somewhat vague, plaintiff's allegations do raise a factual issue as to whether defendant was her fiduciary. The undisputed and substantial difference in the parties' level of financial sophistication, particularly as to the transaction in question, combined with defendant's aggressive pursuit of plaintiff's business and the parties' subsequent dealings, satisfies us that plaintiff has raised a genuine question in this regard. (See, *e.g., Melvin State Bank v. Crowe* (1968), 97 Ill. App. 2d 82.) We therefore may not assume that the trial

court found or would have found otherwise. See *Consumer Electric Co. v. Cobelcomex, Inc.* (1986), 149 Ill. App. 3d 699, 704 (where non-movant's affidavit raises genuine issue of fact, trial court may not resolve issue without evidentiary hearing).

■■■ We cannot conclude, however, that even the existence of a fiduciary relationship would save this cause from the limitations' bar. Fraudulent concealment necessarily requires that the plaintiff show that the facts putting her on notice of her cause of action were actually *concealed*. (Ill. Rev. Stat. 1989, ch. 110, par. 13—215; *McDaniel v. La Salle Ambulance Service, Inc.* (1982), 108 Ill. App. 3d 1042, 1045.) Thus, although a defendant's silence may amount to fraudulent concealment where it does *in fact* conceal matters from the plaintiff, here the information actually available and disclosed to plaintiff—and the facts of which plaintiff was aware, such as that her investment was the obligation of a private corporation, that her interest payments were suspended, and that she herself had converted half of her "CDs" to common stock—put plaintiff on notice by the end of 1984 of defendant's alleged fraud.

Similarly, although the existence of a fiduciary relationship may excuse a plaintiff's failure to investigate diligently to ascertain facts that would put her on notice of possible injury, there is plainly a difference between the failure to *ascertain* facts through diligent inquiry and the failure to *act upon* facts of which the plaintiff *already* has actual knowledge. Although plaintiff argues that defendant could have given her adequate notice only via a written warning that "THIS INSTRUMENT IS NOT A CD," we see no reason why, even as to an unsophisticated investor, the information of which plaintiff was actually or constructively aware was not fully as effective in triggering her duty of inquiry.

We therefore hold that the trial court properly granted defendant's motion to dismiss.

We also believe that the trial court properly denied plaintiff's motion to amend her complaint to add a cause of action for breach of a written contract. The denial of leave to amend will be upheld absent an abuse of discretion. *Plocar v. Dunkin' Donuts of America, Inc.* (1981), 103 Ill. App. 3d 740, 749-50.

Plaintiff's theory is that her amended complaint states a cause of action against defendant because (1) the documents she attached to the original complaint, including the schedule of proposed interest rates and maturities for various "CDs," the corporate records indicating defendant's payment of principal and interest on the first "CD" by November 1981, and defendant's November 1981 letter thanking

plaintiff for her initial investment, amount to a written contract with CSC to purchase "CDs" in 1982 and (2) even though the "contract" was with CSC, plaintiff is entitled to pierce the corporate veil and hold defendant personally liable because, as defendant was CSC's sole or dominating shareholder at the time of the contract, CSC was defendant's "alter ego" and he may therefore be held liable for the corporation's obligations.

 █ We find no merit in plaintiff's arguments. The documents on which she relies evidence at most a contract for the initial purchase of "CDs," which plaintiff has acknowledged all along that defendant honored. Nothing remotely resembling a written contract for later purchases is presented by these documents.

Moreover, even assuming *arguendo* that plaintiff properly alleged a written contract, her amended complaint is fully inadequate to enable her to pierce the corporate veil. The general rule is that a corporation is an entity separate and distinct from its officers, shareholders and directors and that they will not be held personally liable for the corporation's debts and obligations. (*McCracken v. Olson Cos.* (1986), 149 Ill. App. 3d 104, 109.) The corporate form may be disregarded under certain limited circumstances where the corporation is merely the alter ego or the business conduit of the dominating personality. (*People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29; *Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 1004.) However, a party seeking to do so must show that (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity. *McCracken*, 149 Ill. App. 3d at 109.

In determining whether the first of these requirements has been met, courts look not to a single factor but consider a number of variables such as inadequate capitalization, failure to observe corporate formalities, the commingling of funds, and the absence of corporate records. (*McCracken*, 149 Ill. App. 3d at 109.) Plaintiff's proposed amendment alleges none of these factors, and the record tends to negate at least the last of them. Plaintiff relies instead on her allegation that defendant was the sole or primary shareholder and her conclusion that CSC was therefore his "alter ego."

Such allegations are inadequate as a matter of law to pierce the corporate veil. There is no minimum number of stockholders for a valid corporate existence, and a corporation with only one shareholder is entirely permissible. (*Gallagher*, 91 Ill. App. 3d at 1005; *Bankers Trust Co. v. Chicago Title & Trust Co.* (1980), 89 Ill. App. 3d 1014,

1019.) Absent any allegation that defendant disregarded CSC's corporate entity, such as by intermixing its finances with his own or using it as a thinly capitalized sham to avoid liability, the mere allegation that he was a dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate existence. *Bankers Trust*, 89 Ill. App. 3d at 1019-21; *Amsted Industries, Inc. v. Pollak Industries, Inc.* (1978), 65 Ill. App. 3d 545, 549-50.

The trial court was therefore within its discretion in denying the motion to amend the complaint.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

WOODWARD and GEIGER, JJ., concur.