In the Matter of VMS LIMITED PARTNERSHIP SECURITIES LITIGATION, Consolidated Pretrial Proceeding.

No. 90 C 2412.

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1992.

---

Ronald A. Schy, Beigel & Sandler, Ltd., Chicago, Ill. and George Croner, Kohn, Klein, Nast & Graf, Philadelphia, Pa., for plaintiffs.

Jerold S. Solovy, Keith F. Bode, Marguerite M. Tompkins, and C. John Koch, Jenner & Block, Chicago, Ill., for Cigna.

Martha A. Mills and David S. Fleming, Schaefer, Rosenwein & Fleming, Chicago, Ill., for Marshall & Stevens, Inc.

Norman J. Barry, Alan S. Madans and Christopher G. Walsh, Jr., Rothschild Barry & Myers, Chicago, Ill., for Joseph J. Blake & Associates.

Lawrence A. Wojcik, Scott R. Lassar and John S. Vishneski, Keck, Mahin & Cate, Chicago, Ill., for Pannell Kerr Forster.

## MEMORANDUM OPINION
## AND ORDER

ZAGEL, District Judge.

 Plaintiffs are a group of disappointed investors who purchased real estate limited partnership interests in 1983. The partnerships were formed to acquire, own, operate, and eventually sell numerous hotels, office buildings and apartment complexes throughout the country. After their investments soured plaintiffs commenced this action for damages. Plaintiffs allege that defendants conspired to defraud them, and in the process violated federal securities and racketeering statutes, as well as various provisions of state law. In four "representative" cases, plaintiffs seek to recover their investment losses from one of the placement agents for the offerings (defendant CIGNA), and from various appraisers who allegedly overvalued the properties.[1] For the reasons stated below, defendants' joint motion to dismiss is granted.[2]

1. The four representative cases are: *Iantuono,* No. 89 C 9390 (Second Amended Complaint), which concerns the Lake Magdalene offering; *Reading,* No. 90 C 809 (Fourth Amended Complaint), which concerns the LaSalle/Market Street offering; *Williams,* No. 90 C 844 (Fifth Amended Class Action Complaint), which concerns the VMS National Hotel Portfolio I and the VMS National Hotel Portfolio II offerings; and *Spitz,* No. 90 C 866 (Third Amended Class Action Complaint), which concerns the VMS National Residential Portfolio I and the VMS National Residential Portfolio II offerings. In plaintiffs' newest complaints, each case is against only CIGNA and one appraiser defendant: Joseph J. Blake & Associates, Inc. (*Iantuono* and *Reading*); Pannell Kerr Forster (*Williams*); and Marshall & Stevens, Inc. (*Spitz*). The VMS defendants remain parties to these suits pursuant to CIGNA's contractual indemnification claims against them, which are not precluded under this Court's settlement bar order.

The bar order in this case precludes contribution and indemnification among defendants, save those founded on contract, and a rule limiting liability to the degree of each defendant's culpability for damage done to plaintiffs. *See Donovan v. Robbins,* 752 F.2d 1170, 1180–81 (7th Cir.1985) (dicta). The choice among three methods of set-off—pro tanto, pro rata and proportionate fault—is debated in the cases. *See In re Jiffy Lube Securities Litigation,* 927 F.2d 155 (4th Cir.1991). The views of judges are not unanimous. *Compare Singer v. Olympia Brewing Co.,* 878 F.2d 596 (2nd Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990) (pro tanto) *with Franklin v. Kaypro,* 884 F.2d 1222 (9th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (proportionate fault). *Accord In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020 (2nd Cir.1992) (same); *Great Lakes Dredge & Dock Co. v Tanker,* 957 F.2d 1575 (11th Cir.1992) (policy favors proportionate fault; since precedent precludes proportionate fault, settlement will not be permitted to bar contribution claims).

There are debates about the administrative advantages of one method over others. But there are few opportunities to test the question (the cases usually settle) hence we do not know which method is most neat in application. In the circumstances of this case, this Court found that the rule of proportionate fault would save the cost and effort of an extensive pretrial hearing to determine each defendant's relative culpability before approving the settlement between plaintiffs and some defendants. Moreover, there is a very real risk that an early hearing would be inadequate because the claims and defenses—the facts of the case—would not have been fully investigated. Thus, an error in assessing comparative fault is more likely at an early stage. Of course, applying proportional fault is not without risks either because the non-settling defendants will accuse the settling defendant at a trial in which the accused is unrepresented. The risk is much reduced, however, since plaintiffs' counsel has real incentive to dispute this defense.

In this case, the Court could adopt a rule other than proportionate fault if it could ignore the question of whether a proposed settlement is unfair to non-settling defendants. But this is a question the Court cannot ignore. *See Donovan, supra.* One could argue that the policy of joint and several liability implies disregard for fairness to non-settlers. But joint and several liability and the policy decision it embodies is not the lodestar it was. Contribution and indemnification doctrines exist to achieve a fair allocation of fault among defendants. And because of such doctrines there will be no settlement in cases like these unless contribution and indemnification claims are barred. I think few judges would close these doors to non-settlers without opening another, and I am not one of those few. The other doors to be opened are (1) fairness hearings for all defendants before settlement approval or (2) adopting a proportionate fault rule. In this case the second alternative is clearly superior administratively. It is under ordinary circumstances, also the fairest.

2. Although plaintiffs did not attach them to their respective complaints, the offering materials are described in the complaints and plaintiffs rely heavily upon them to state a cause of action. Defendants provided the offering materials to the Court in connection with their motion to dismiss. This Court has previously held,

## I. BACKGROUND

As befits the procedural posture of this action, we must accept as true all the well-pleaded factual allegations and inferences reasonably drawn from them. *Illinois Health Care Assoc. v. Illinois Dep't of Public Health,* 879 F.2d 286, 288 (7th Cir.1989). Dismissal is proper if it appears beyond doubt that the plaintiffs can prove no set of facts that would entitle them to relief. *Id.*

Plaintiffs allege that in 1982 defendants embarked on a scheme to defraud them through the organization, marketing and control of real estate investment programs. Of course, such a scheme cannot succeed without investors. And a potential investor will not commit unless he is convinced that the probability of success of the investment outweighs the risk of a bust. So defendants conspired, according to plaintiffs, to wrongfully induce them to purchase limited partnership securities by deceiving them about the probable success of the investments and the risks involved.

Plaintiffs aver that defendant CIGNA wooed them by emphasizing that CIGNA thoroughly investigated dozens of investments before choosing an investment that it would recommend. They allege that CIGNA stated it would choose only the most conservative tax-advantaged investments, and that CIGNA prepared detailed financial plans for plaintiffs to gain their trust and confidence. According to plaintiffs, however, the centerpiece of defendants' fraudulent scheme was the offering materials wherein defendants described the limited partnership offerings.

The offering materials consisted of private placement memoranda, prospectuses, an undated VMS National Hotel Investment Summary, information from CIGNA's "red book," and other information and representations communicated by defendants.

The private placement memoranda concerning the six properties in question consisted of a textual section describing the offering and multiple exhibits including financial forecasts and a subscription agreement. Generally speaking, projections in the private placement memoranda indicated that tax benefits would result in the early years of an investment in the partnerships. After 11 to 14 years, upon the sale of the properties, the partnerships would receive proceeds sufficient to return a profit.

The plaintiffs allege that the offering materials included a number of intentional misrepresentations and omissions and that defendants relied on false or misleading assumptions to arrive at projections. Specifically, the plaintiffs allege that defendants made the following misrepresentations:

(a) the cost of the various properties to the partnership would be either less than the appraised value or substantially less than their replacement cost;

(b) the partnerships were reasonably expected to be profitable or rents for the properties were substantially below market and rental revenues and could be reasonably expected to rise significantly;

(c) the partnership's cost of acquiring the properties was favorable;

(d) investments in the partnerships were secure, would likely be profitable, and would provide substantial tax benefits;

(e) the projections as to rent increases were based on reasonable assumptions, supported by "due diligence," "analysis of market conditions," and "market studies";

(f) the properties could support a minimum 10% cumulative return to investors; and

(g) investors would enjoy an after-tax gain even if the properties were sold [at a certain date] for only $1 above existing indebtedness.

*Sullivan v. Group W Cable Associates,* 1991 WL 164488 at *2 1991 U.S.Dist.LEXIS 11571 at *3 (N.D.Ill. Aug. 16, 1991), and continues to hold that in situations such as this offering materials may be considered on a motion to dismiss. *Accord Field v. Trump,* 850 F.2d 938, 949 (2nd Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989) (same); *Townsend*

*v. Columbia Operations,* 667 F.2d 844, 848 (9th Cir.1982) (same); *see also Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991) (offering materials considered on motion to dismiss even though materials not attached to complaint); 5 Charles Wright and Arthur Miller, *Federal Practice and Procedure,* § 1327 at 762–63 (1990).

Finally, plaintiffs allege CIGNA told them that investing in the partnership was an integral part of implementing their financial plan and that an investment therein would provide safety of invested principal.

Plaintiffs contend that the above representations were false in that

(a) the true appraised value of the properties was substantially below what defendants represented;

(b) the properties' rents were not substantially below market and could not be raised as represented; and

(c) the partnership was a *high risk* investment with investors facing a substantial risk of losing their entire investment, *not* a conservative means to preserve capital or earn at least a 10% return on funds invested, as CIGNA represented to plaintiffs. (Emphasis in complaint.)

In addition, plaintiffs allege that defendants failed to disclose material facts about investment in the partnerships. These alleged material omissions include:

(a) that defendant CIGNA (who was also acting as the financial planner for plaintiffs) was to receive substantial fees as a result of plaintiffs' purchase of interests in the partnership, and that CIGNA would not have recommended the partnership to plaintiffs in the absence of such commissions;

(b) truly independent appraisals of the properties were substantially less than the partnerships paid;

(c) the partnership's use of negative amortization financing had a detrimental effect on equity build-up and also increased the risk created from even a small decline or only moderate growth in the value of the properties; and

(d) the projections in the offering materials were based on unreasonable assumptions.

The private placement memoranda contained information other than the alleged misrepresentations and omissions: the memoranda emphasized the risks inherent in the offering. The cover page of the memoranda stated unequivocally that the "offering involves a high degree of risk," and referred to the section of the memoranda discussing "risk factors." The cover page also noted prominently:

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE GENERAL PARTNERS ... AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN PERSONAL COUNSEL, ACCOUNTANT AND OTHER ADVISERS AS TO LEGAL, TAX, ECONOMIC AND RELATED MATTERS CONCERNING THE INVESTMENT DESCRIBED HEREIN AND ITS SUITABILITY FOR HIM.

Furthermore, the memoranda warned that, except for other information authorized by the general partners, "NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE ANY INFORMATION, WITH RESPECT TO THESE UNITS, EXCEPT THE INFORMATION CONTAINED HEREIN."

The cover page of the memoranda also contained the following admonishment: "INVESTMENT IN THE UNITS IS SUITABLE ONLY FOR INVESTORS WHO MEET THE SUITABILITY STANDARDS DESCRIBED UNDER 'WHO SHOULD INVEST.'" That section stated that "[i]nvestment in the units involves a high degree of risk" and is suitable only for persons who "could withstand a loss of their entire investment in the Units." Four of the six memoranda went on to state, in these or similar words, that an investor should, either alone or with his purchaser representative, have "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Units."

The first page of each memorandum announced that CIGNA and other placement agents were being paid substantial fees. Though the amount of the aggregate commission varied (all were quite high), the memoranda disclosed in the following or similar language:

Each Placement Agent will receive commissions at the rate of [7%–8%] for units

placed by it (up to an aggregate maximum of $5,856,000), and an expense allowance equal to approximately [2%–3%] of the offering price of the Units placed by it (up to an aggregate maximum of $1,464,000).... The Placement Agents may also be entitled to other compensation.

Additionally, the cover page of the memoranda disavowed any representation or implication as to the accuracy or completeness of the attached accounting projections, which were based on stated assumptions and hypotheses. "FUTURE OPERATING RESULTS AND VALUES OF THE [PROPERTIES] ARE IMPOSSIBLE TO PREDICT AND NO REPRESENTATION OF ANY KIND IS MADE RESPECTING THE FUTURE ACCURACY OR COMPLETENESS OF THESE PROJECTIONS." The attached letter from the accounting firm providing the projections echoed the warnings and qualifications contained in the cover page. The letter stated that because the projections are based on assumptions and estimates that are inherently subject to uncertainty and variation, "we do not represent them as results that will actually be achieved."

The memoranda detailed the leveraged nature of the investments and the manner in which "wraparound" mortgages and "negative amortization" loans were being used to finance the properties. And the memoranda stated unequivocally that "[l]everaging increases the Partnership's exposure to losses as well as the amount thereof." The memoranda explained:

A loan requiring a balloon payment involves a greater risk than a loan where the principal amount and all accrued interest is amortized over the term of the loan since the ability of the Partnership to repay the outstanding principal amount and all accrued interest on such loan on its maturity will be dependent upon the ability of the Joint Venture or the Sub–Partnerships to obtain adequate refinancing or to sell the relevant Project, which in turn will be dependent upon economic conditions in general and the value of the Project in particular.

In a section entitled "risk factors," the memoranda were replete with warnings about the risky nature of the offering. The memoranda stressed the uncertainty involved in the financial forecasts contained in the memoranda, the difficulty involved in projecting profitability in a venture that lacks a sufficient operating history, and the potentially negative effect of forces outside the control of the managing partner. For example, the memoranda noted the potentially adverse effect of a change in tax laws or governmental regulations such as rent control or zoning requirements; change in the characteristics of the local area, or excessive building resulting in an excess supply of residential apartments. The possibility that the Internal Revenue Service might treat the partnerships as an association taxable as a corporation, thereby eliminating the anticipated tax benefits from investment in the Units, was also discussed in various sections of the memoranda. The letter providing accounting projections also highlighted the potential for an adverse ruling on the tax status of the partnerships. Additionally, the memoranda warned that the property appraisals "are based upon the judgment of the appraiser and there can be no assurance that the [purchase price of the property] fairly reflects its fair market value."

Finally, the memoranda required each investor to sign a subscription agreement. By signing the agreement, the investor warranted expressly, among other things, that he (1) understood the risks of the investment; (2) was able to "bear the economic risk of losing his entire investment"; (3) had read the offering materials or reviewed them with his Purchaser Representative; (4) acknowledged that the placement agent would receive from the partnership compensation as described in the memoranda; (5) understood that forces beyond the control of the partnership could have an adverse effect on the partnership's tax status; (6) was aware that the financial projections in the memoranda were included "for illustration purposes only and no assurance is given that actual results will correspond with the results contemplated

therein"; and (7) recognized that "the Partnership has no financial or operating history: this is the Partnership's first venture and that the Units are speculative investments which involve a high degree of risk of loss by the undersigned of his entire investment in the Partnership."

In sum, the memoranda, attached exhibits, accounting projections and subscription agreement provided disclosure of the risky and speculative nature of the offering. Plaintiffs, after signing the subscription agreement which acknowledged their understanding of the risks inherent in the investment program, purchased limited partnership interests. Plaintiffs commenced these actions in 1989 and 1990. They seek to recover their investment losses allegedly caused by defendants' fraudulent conduct.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction*

■ Plaintiffs allege that defendants participated in a pattern of fraudulent conduct arising out of the sale to them of limited partnership interests. They allege that defendants' fraudulent conduct violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) and Rule 10b–5, 17 CFR § 240.10b–5 (1990), promulgated thereunder, as well as various sections of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq., and common law principles. Plaintiffs further allege that many of the acts and transactions of which they complain took place in the Northern District of Illinois, and that many of the defendants reside or maintain their principal place of business in this district. Based upon plaintiffs' allegations, this Court has personal jurisdiction over the defendants pursuant to 15 U.S.C.A. § 78aa and 18 U.S.C.A. 1964(a).

### B. *Federal Claims*

#### 1. Plaintiffs' Securities Claims Are Time–Barred

■ Defendants assert that under *Lampf, Pleva, Lipkind, Prupis & Petgrow v. Gibertson,* —— U.S. ——, —— – ——, 111 S.Ct. 2773, 2781–82, 115 L.Ed.2d 321 (1991) and *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), the uniform one-year/three-year federal limitations period governs plaintiffs' securities fraud claims. In *Lampf,* the Court held that "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf,* —— U.S. at ——, 111 S.Ct. at 2782. The Court also held that the one-year/three-year limitations period was not subject to the doctrine of equitable tolling, and that it applied retroactively to bar the claims in that case because, as here, there was "no dispute that the earliest of plaintiffs-respondents' complaints was filed more than three years" after the allegedly fraudulent limited partnership offerings. *Id.*[3]

On the same day the Supreme Court decided *Lampf,* the Court also issued its decision in *Jim Beam.* There, the Court stated that "it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so." *Jim Beam,* —— U.S. at ——, 111 S.Ct. at 2446. Since the *Lampf* Court applied the one-year/three-year limitations period to bar the claims in that case, "*Jim Beam* made *Lampf* applicable to every ongoing securities fraud case in the land." *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1458 (7th Cir.1992). And if applied in this case, the one-year/three year limitations period adopted in *Lampf* would knock out plaintiffs' securities fraud claims.

**3.** The *Iantuono* plaintiffs purchased their investments in late 1983; they filed suit in December 1989. The *Reading* plaintiffs purchased their investments in late 1984; they sued in February 1990. The *Spitz* plaintiffs purchased their investments pursuant to an October 1984 private placement memorandum; they filed suit in February 1990. The *Williams* plaintiffs purchased their investments pursuant to an October 1985 private placement memorandum; they also filed suit in February 1990.

Not surprisingly, plaintiffs do not dispute that their securities claims are time-barred if the one-year/three-year limitations period governs, for the earliest of these suits was filed in December 1989 and the parties agree that the offerings and alleged fraud occurred between 1983 and 1985. Rather, plaintiffs contend that Congress' recent amendment to the Federal Deposit Insurance Corporation Improvement Act of 1991—passed to reverse the combined effect of *Lampf* and *Beam*—precludes retroactive application of the one-year/three-year rule. We disagree. Even if this newly enacted law, codified as § 27A of the Exchange Act, provided the rule of decision in this case, the result would be the same: the one-year/three-year limitations period bars plaintiffs' 10(b) claims. This is because § 27A provides that the limitation period for suits initiated before *Lampf* is the period that lower courts in the relevant jurisdiction had applied on June 19, 1991, just prior to *Lampf's* issuance.[4]

This circuit adopted the one-year/three-year limitation period for 10(b) claims almost a year before the Supreme Court embraced the very same rule in *Lampf.* *Short v. Belleville Shoe,* 908 F.2d 1385, 1992 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). In addition to adopting the one-year/three year rule, the Seventh Circuit applied the new rule retroactively to the plaintiff in *Short. Short,* 908 F.2d at 1390. The court stated that retroactive application was proper because the plaintiff "claims to have been unaware of the basis

for litigation until a short time before filing suit," and, therefore, "cannot have relied on [the old limitations period under] Illinois law." *Id.* Similarly, though their newest complaints are silent on the issue, plaintiffs here alleged in their prior complaints that they were unaware of the basis for their securities claims until shortly before they filed suit.[5] Given plaintiffs' previous disavowal of awareness of the basis for their claims and the lack of an affirmative allegation of reliance in their current complaints, the only logical inference is that plaintiffs did not delay filing suit in reliance on Illinois law. Thus, under the reasoning of *Short,* retroactive application of the one-year/three year rule is appropriate in this case. *See Lewis v. Hermann,* 775 F.Supp. 1137, 1146 (N.D.Ill.1991) (Aspen, J.) ("because [plaintiff] was unaware of his claims until after the new period of repose expired, he could not have delayed filing suit in reliance on Illinois law"); *In re VMS Securities Litigation,* 752 F.Supp. 1373, 1388 (N.D.Ill.1990) (Conlon, J.) ("Because plaintiffs were unaware of their claims, they could not have delayed filing suit in reliance on Illinois law").

Our inquiry does not end here, however. Though the court applied the new limitations period to the plaintiffs' § 10(b) claims in *Short,* it expressly reserved for the future a ruling on the issue of retroactive application of the new rule for all § 10(b) claims. *Short,* 908 F.2d at 1389–90. To determine whether the new rule applies to the parties before us, Congress instructs us through § 27A "to use 'principles of

---

**4.** Section 27A provides:

The limitation period for any private civil action implied under section 10(b) of [the Securities Exchange Act of 1934] that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

Pub.L. No. 102–242, Title IV, § 476, 105 Stat. 2236, 2387 (1991) (FDIC Improvement Act), codified at 15 U.S.C.A. § 78aa–1. Courts are in disagreement as to the constitutionality of § 27A. *Compare, e.g., Plaut v. Spendthrift Farm,* 789 F.Supp. 231 (E.D.Ky.1992) (law found unconstitutional); *In re Brichard Securities Litigation,* 788 F.Supp. 1098 (N.D.Cal.1992) (same)

with *Anixter v. Home–Stake Production Co.,* — F.2d —— No. 90–5040 (10th Cir. August 24, 1992) (law found constitutional); *Adler v. Berg Harmon Assoc.,* 790 F.Supp. 1235 (S.D.N.Y.1992) (same); *Bankard v. First Carolina Communications,* No. 89 C 8571, 1992 WL 3694 (N.D.Ill. Jan. 3, 1992) (same). Because the result is the same in this case regardless of whether we apply § 27A, we need not address the statute's constitutional validity.

**5.** Moreover, plaintiffs conceded in their earlier brief opposing defendants' dismissal motion: "[P]laintiffs did not know about the fraud until shortly before the complaints were filed." Plaintiffs' (12/30/90) Brief In Opposition To Dismiss at 28.

retroactivity' as they stood the day before *Jim Beam* was decided." *McCool,* 972 F.2d at 1458. On June 19, 1991, the controlling precedent on whether a new rule will be applied to the parties before the court was *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Under *Chevron Oil,* prospective application of a new rule is required where: "(1) the decision at issue overrules clear precedent on which litigants may have relied or addresses an issue of first impression which was not foreshadowed; (2) retroactive application of the decision would retard the operation of a federal statute; and (3) retroactive application would result in substantial inequity." *McCool,* 972 F.2d at 1459 (citations omitted).

The escape hatch found in *Chevron Oil* does not work for plaintiffs. Though prior precedent on the applicability of the Illinois limitations period was clear, *McCool,* 972 F.2d at 1459, plaintiffs here concede (by implication at least) that they did not delay filing suit in reliance upon the earlier limitations rule. Without such reliance, application of the one-year/three-year rule does not result in substantial inequity to plaintiffs. Thus, under the rule articulated in *Short* and later adopted in *Lampf,* as well as applicable principles of retroactivity, plaintiffs' securities claims are time-barred.

### 2. RICO Claims

#### a. Plaintiffs' RICO Claims Are Not Time–Barred

■ Defendants contend that plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1964, are also time-barred. Unlike the securities claims, however, the battleground here is not the length of the limitation period; the period of limitation for civil RICO actions is four years. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 149–154, 107 S.Ct. 2759, 2764–66, 97 L.Ed.2d 121 (1987).

Rather, the present dispute centers upon when the limitation period begins to run on civil RICO claims—a question that *Malley–Duff* left undecided. Until its recent decision in *McCool v. Strata Oil Co.,* 972 F.2d 1452 (7th Cir.1992), the Seventh Circuit was the only federal appellate court that had yet to adopt either the "last predicate act" or "discovery" rule, the two civil RICO accrual standards that have been debated in the federal courts. *McCool* embraced the discovery rule, but applying that rule to the facts of this case remains a sticky task. Therefore, a close look at the question of civil RICO accrual is in order.

■ Before the *McCool* court ended the debate, several of the district courts in this circuit followed the last predicate act rule. *McCool,* 972 F.2d at 1464 (citations omitted).[6] The last predicate act rule, espoused by the Third Circuit, holds that the limitations period "begins to run 'from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity.' " *Id.* at 1464 (*quoting Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1130–31 (3rd Cir.1988). The overwhelming majority of circuit courts had adopted some form of the discovery rule before *McCool* was decided. *Id.* at 1464–65 (citations omitted). Under the discovery rule as articulated by the *McCool* court, the statute of limitations begins to run once there is a RICO violation and the plaintiff knew or should have known that he was injured. *Id.* at 1464.

The court in *McCool* did not discuss in detail the reasons for preferring the discovery rule over the last predicate act rule, probably because the subject has been covered at length by other courts. *See, e.g., Rodriguez v. Banco Central Corp.,* 917 F.2d 664, 665–68 (1st Cir.1990); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102–04 (2nd Cir.1988), *cert. denied,* 490 U.S.

---

**6.** A minority of the district courts in this jurisdiction applied the discovery rule even before the Seventh Circuit issued *McCool. See In re VMS Securities Litigation,* 752 F.Supp. 1373, 1390 (N.D.Ill.1990); *McCool v. Strata Oil Co.,* 724 F.Supp. 1232, 1237 (N.D.Ill.1989); *Condesa*

*Del Mar, Inc. v. White Way Sign and Maintenance Co.,* No. 86 C 9116, 1987 WL 17474 (N.D.Ill. Sept. 24, 1987); *Electronic Relays (India) Pvt., Ltd. v. Pascente,* 610 F.Supp. 648, 653 (N.D.Ill.1985).

1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Instead, the *McCool* court focused on defining its formulation of the discovery rule in relation to other articulations of the rule advanced by the various courts of appeals. But the reasons why the discovery rule is the better accrual standard have a direct bearing on our application of the rule in this case. It is appropriate, therefore, that we address those reasons here.

The Second Circuit's decision in *Bankers Trust* is particularly instructive in this regard. There, the court noted that to determine accrual of a criminal RICO violation, courts focus on when the acts of a defendant constitute a violation. *See Bankers Trust*, 859 F.2d at 1102. For example, to establish criminal liability under § 1962(c), the government must prove the defendant committed at least one predicate racketeering act within the five-year federal limitations period. *United States v. Persico*, 832 F.2d 705, 714 (2nd Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988). Similarly, the last predicate act standard for accrual of civil RICO actions also focuses on when the defendant's alleged acts of racketeering occurred. But as the *Bankers Trust* court noted, to recover civil damages for the same criminal violation there is an additional requirement.

> Section 1964(c) provides that only a 'person injured in his business or property *by reason of* a violation of section 1962' may bring a civil RICO action. Thus, a civil plaintiff must prove not only that the acts of defendant constitute a RICO violation, but also that plaintiff suffered injury *as a result of* that violation. Until such injury occurs, there is no right to sue for damages under § 1964(c), and until there is a right to sue under § 1964(c), a civil RICO action cannot be held to have accrued.

*Bankers Trust*, 859 F.2d at 1102 (citations omitted) (emphasis supplied).[7]

*Bankers Trust* establishes that the plain language of the statute requires courts, in deciding when a civil RICO action accrues, to determine not only when the alleged acts of racketeering occurred but also when those acts resulted in an injury to the plaintiff. *See McCool*, 972 F.2d at 1464 (limitations period runs once there is a RICO violation and the plaintiff discovers the injury). By focusing solely on the racketeering activity without taking the necessary step of inquiring when that activity causes injury, the last predicate act standard marks accrual prematurely.[8] This is because, as the *Bankers Trust* court reasoned persuasively in embracing the discovery rule, the plaintiff cannot recover damages in a civil RICO action until he has been injured "by reason of" the alleged racketeering activity. *Id.* In short, it is the injury to the plaintiff, not the racketeering activity, that triggers the statute of limitations for civil RICO claims. *Id.* at 1102–03; *Landy v. Mitchell Petroleum Technology Corp.*, 734 F.Supp. 608, 625 (S.D.N.Y.1990).

When did plaintiffs in this case learn that they were injured as a result of defendants' alleged pattern of racketeering? Defendants invite the Court to conclude that if plaintiffs suffered a RICO injury, their injuries occurred more than four years ago when they relied on the allegedly

---

**7.** In a slightly different context, the *McCool* court also "reject[ed] the analogy to criminal prosecutions under RICO, where the last predicate act rule applies," emphasizing that unlike a criminal RICO violation, "a civil RICO claim depends on the existence of an injury ..." *McCool*, 972 F.2d at 1466 (discussing application of the "separate accrual" rule to civil RICO claims).

**8.** Though racketeering activity and the injury that results from that activity may often occur simultaneously, they do not always coincide. Sometimes injury lags behind. In such a situation, bypassing the injury prong of the analysis would mark accrual of an action prematurely.

In this way, skipping the second part of the RICO accrual analysis that focuses on the plaintiff's injury can result in the restricting of civil RICO in contravention of Congress' mandate that RICO "shall be liberally construed to effectuate its remedial purposes." Organized Crime Control Act, Pub.L. No. 91–452, § 904(a) (codified at 18 U.S.C.A. § 1961 note (1982); *Sedima, S.P.R.I. v. Imrex Co., Inc.*, 473 U.S. 479, 496–99, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985); *see also Keystone Ins. Co.*, 863 F.2d at 1128 ("[a]t a minimum the liberal construction language requires that we resist the temptation to restrict civil RICO").

fraudulent offering materials to purchase securities. Defendants argue that the offering materials contained risk disclosures expressly contrary to the misrepresentations and omissions on which plaintiffs base their RICO claims. Thus, the argument goes (counterintuitive as it may sound), plaintiffs should have been aware when they signed their initial investment contracts that they had sustained an injury from defendants' alleged fraud.

The lower court in *McCool v. Strata Oil Co.*, 724 F.Supp. 1232, 1237 (N.D.Ill.1989), *rev'd in part and aff'd in part, McCool,* 972 F.2d 1452 (7th Cir. Aug. 21, 1992), applied the discovery rule in the manner advocated here by defendants. The court held that the plaintiffs' RICO claims were time-barred because they should have known of their injuries when they signed their investment contracts. *McCool,* 724 F.Supp. at 1237. Like plaintiffs here, the plaintiffs in *McCool* were investors who alleged that they had been defrauded through material misrepresentations and omissions by the defendants. *Id.* at 1233–34. The court reasoned that because these alleged misrepresentations were contradicted by written investment agreements that the plaintiffs signed, the plaintiffs' RICO action accrued on the date they agreed to make their investment. *Id.* at 1237–38; *accord Bender v. Rocky Mountain Drilling,* 648 F.Supp. 330, 334–35 (D.D.C.1986).

Upon review, the Seventh Circuit did not agree that contradictions between the alleged misrepresentations and the investment agreements signed by the plaintiffs "necessarily notified the investors about the alleged fraud." *McCool,* 972 F.2d at 1462. With some of the representations and contractual provisions that the lower court found contradictory, the court saw no inconsistency. *Id.* at 1462–63. In other instances where the district court found glaring contradictions, the court opined that unless they happened to be an experienced oil and gas attorney, the plaintiff-investors would not have detected the inconsistencies discerned by the district court. For example, the court disagreed with the district court's conclusion that the agreements informed the investors that the

contract merely gave them a "working interest" in a mineral lease, not a "tenancy in common." The court expressed doubt that "a reasonable *investor* (or even a non-specialist lawyer) can be presumed to know that the terms have different meanings." *Id.* at 1462 (emphasis in original). Nor did the Seventh Circuit agree with the lower court's assertion that since the agreements contained both terms, "the plaintiffs had sufficient information from which they could have discovered defendants' fraud had they exercised due diligence." *McCool,* 724 F.Supp. at 1236. Rather, the court referred to the existence of both terms in the agreements only as a potential source of confusion for investors. *McCool,* 972 F.2d at 1462. The court noted, however, that "[i]f the plaintiffs had consulted lawyers before investing, we would not hesitate to conclude that the Agreements fully notified them of the discrepancies between what they were promised and what they actually bought." *Id.* at 1463.

Having rejected the district court's conclusion that the investors should have discovered the alleged fraud when they signed the initial investment agreements, the Seventh Circuit refused to hold that the limitations period on the investors' securities fraud and RICO claims began to run when they made their initial investment in February of 1984. Rather, the court held that the period of limitations for those claims began to run in October 1984, when the plaintiffs signed a second set of investment agreements. *Id.* The court stated that the investors may have reasonably believed that the February 1984 agreements gave them an interest in a mineral lease and a well. *Id.* Eight months later, however, the investors signed identical agreements in which they were asked to invest in another well on the same property. And in contrast to the February agreements, which reflected a transaction for a lease and a well, the October agreements recorded a transaction for a well only. *Id.* The court concluded that this discrepancy should have alerted the investors that "[s]omething [was] clearly amiss when the same piece of paper purports to mean dif-

ferent things on different occasions." *Id.* at 1463.

Unfortunately, the Seventh Circuit's application of the discovery rule in *McCool* does not make easy our application of the rule in this case. Here, unlike *McCool*, the asserted contradictions do not turn on an understanding of legal jargon such as "working interest," "tenancy in common" or "overriding royalty interest." *See Id.* at 1462. They lie in the conflict between positive characterizations of risk and potential financial benefit versus explicit disclosures about the risky nature of the investment and the inherent uncertainty of financial projections based on assumptions and estimates. Therefore, we cannot conclude, as did the *McCool* court, that if plaintiffs had consulted lawyers before investing they would have discovered a discrepancy between what they were allegedly promised and what they actually purchased. Moreover, the investors in this action were not asked to sign a second investment contract that on its face contradicted the original investment contract. The contrast between the alleged misrepresentations and the disclosures in the offering materials may have alerted plaintiffs that prospects for the success of their investments were not as sanguine as defendants wanted them to believe—a discrepancy they could reasonably have attributed to puffing. But nothing was so clearly amiss that we can conclude that plaintiffs should have discovered the alleged fraud when they signed their investment contracts.

For the foregoing reasons, we decline to hold that the limitation period for plaintiffs' RICO claims began running on the date they purchased their limited partnership interests. To decide otherwise would require the Court to reach the cumbrous conclusion that by reading boilerplate warnings and disclosures in the offering materials plaintiffs discovered or should have discovered their injuries at the time they agreed to invest. We decline to do so not because boilerplate warnings and disclosures serve no purpose. But in civil RICO actions, where a plaintiff must have knowledge of a defendant's actions and the knowledge that they were actually harmed by those actions, more is needed before a plaintiff can be charged with a cognizable injury.

We hasten to add that this opinion should not be taken to say that the statute of limitations period on civil RICO claims only begins to run when a plaintiff suffers out-of-pocket money damages. Nor do we mean to suggest that a plaintiff seeking RICO damages has no duty to investigate circumstances indicating that he may have been the victim of racketeering activity. Rather, we hold that the kind of disclosures routinely present in offering materials, such as those contained in the offering materials here, are not sufficient, standing alone, to trigger the limitations period for civil RICO claims.

There is no evidence in the record as to when plaintiffs discovered the injuries that they allegedly sustained as a result of defendants' racketeering activities. The record has not been developed on this point, which is unsurprising since statute of limitations arguments are often not raised until the summary judgment phase. For purposes of this aspect of the case, the Court is not at liberty to assume a date of discovery; in fact, we are constrained to give plaintiffs the benefit of the doubt. (This contrasts with plaintiffs' obligation to allege reliance on prior law to justify a delayed filing of the securities claims.) Therefore, the motion to dismiss on statute of limitations grounds must be denied.

### b. Plaintiffs Have Failed To State A Claim Under RICO

Plaintiffs' Rico claims, which are brought under 18 U.S.C. § 1962(c) against defendant CIGNA only, are founded on the same misrepresentations and omissions alleged in connection with the sale of limited partnership interests. So, too, are the related claims for mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). Plaintiffs allege that CIGNA's fraudulent activities in connection with the sale of limited partnership interests, and its use of the mails and wire communications in furtherance of those activities, constitute a violation of RICO. The RICO pattern par-

allels the securities fraud allegations: plaintiffs claim they were fraudulently induced to invest in the partnerships by misrepresentations and omissions in the offering materials. Thus, all of the predicate acts are claims of misrepresentation in connection with the private placement memoranda and the other offering materials.

In the court's view, plaintiffs' RICO claims, as well as the related mail and wire fraud claims, are inadequate as a matter of law. Plaintiffs have failed to allege specific facts sufficient to overcome the exhaustive disclosures and warnings contained in the private placement memoranda and the subscription agreements that plaintiffs signed. Those disclosures and warnings undermine plaintiffs' allegations of fraudulent misrepresentation and omission which, in turn, destroys the basis upon which plaintiffs' theory of fraudulent inducement is founded. *See Harner v. Prudential Securities, Inc.,* 785 F.Supp. 626, 640–42 (E.D.Mich.1992) (RICO claim failed where plaintiff could not show reasonable reliance on alleged misrepresentations sufficient to support underlying securities fraud claim).[9]

As defendants outlined in detail in their brief, the memoranda advised plaintiffs of the very matters and risks that plaintiffs allege were either misrepresented or not disclosed. Plaintiffs allege that defendants misled them into believing that the partnership interests were "secure," "conservative" investments that were "reasonably expected to be profitable." These representations were false, according to plaintiffs, because the partnerships were "high risk investment[s] with investors facing a substantial risk of losing their entire investment." Yet this alleged falsehood is directly contradicted in the "Who Should Invest" section of the memoranda: "[i]nvestment in the units involves a high degree of risk" and is suitable only for persons who "could withstand a loss of their entire investment in the Units." The cover page of the memoranda also warned that the "[o]ffering involves a high degree of risk," and referred to the "Risk Factors" section, which detailed the risks inherent in the investments. Moreover, by signing the subscription agreement, plaintiffs expressly acknowledged that "the Units are speculative investments which involve a high degree of risk of loss by the undersigned of his entire investment." Hence, disclosures about the risky nature of the investments could hardly have been more plain.

Several of the alleged misrepresentations and omissions relate to the accuracy of projections in the memoranda and the reasonableness of the assumptions on which they are founded. Yet the memoranda repeatedly warned investors that the projections were based on assumptions and estimates that are inherently uncertain and subject to variation. Reiterating this warning, the accounting firm's letter accompanying the financial projections emphasized that they were not presenting their projections "as results that will actually be achieved." Similarly, investors were warned that the property appraisals "are based upon the judgment of the appraiser and there can be no assurance that the [purchase price of the property] fairly reflects its fair market value."[10] All projections were qualified by the following overarching cautionary message: "FUTURE OPERATING RESULTS AND VALUES OF THE [PROPERTIES] ARE IMPOSSIBLE TO PREDICT AND NO REPRESENTATION OF ANY KIND IS MADE RESPECTING THE FUTURE ACCURACY OR COMPLETENESS OF THESE PROJECTIONS." Indeed, plaintiffs acknowledged in their subscription agreements that "the forecasts included in the [memoranda] have been included for illustration purposes only and no assurance is given that

**9.** *See also Kushner v. DBG Property Investors, Inc.,* 793 F.Supp. 1161 (S.D.N.Y.1992) (same); *Bull v. Chandler,* [1991–1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) § 96,567 at 92,619 (N.D.Cal. Mar. 12, 1992) (same).

**10.** In addition to attacking the accuracy of the property appraisals, plaintiffs allege that defendants failed to disclose that "truly independent appraisals of the Property were much lower than [represented]." The complaints do not state who prepared these "independent appraisals," when they were prepared, or whether defendants even knew of their existence. In short, the allegation is hopelessly vague.

actual results will correspond with the results contemplated therein."

The offering materials also contained specific warnings about projections regarding the rental market and possible tax benefits—subjects that plaintiffs say defendants misrepresented. For example, the "Risk Factors" section noted several elements beyond the control of the managing partner that could affect the rental market negatively such as a change in rent control or zoning requirements, and excessive building resulting in an overabundance of residential apartments. And in various sections of the memoranda investors were warned that the IRS might take action that would eliminate the anticipated tax advantages from investment in the partnerships. These risks were also stated in the subscription agreement that the investors signed.

Furthermore, contrary to plaintiffs' assertion, defendants did not fail to disclose that CIGNA was to receive substantial fees as a result of plaintiffs' purchase of limited partnership interests. As noted earlier, the first page of each memoranda alerted investors that CIGNA and other placement agents would be paid substantial fees for their services. The memoranda noted that those fees included placement commissions at the rate of 7%–8%, an expense allowance ranging from 2%–3% of the offering price of the units placed by the agent, as well as other unspecified compensation. And like the other disclosures previously discussed, plaintiffs acknowledged in their subscription agreements that the placement agent would receive compensation from the partnership as described in the memoranda.

Finally, despite plaintiffs' allegations to the contrary, defendants did not fail to inform them that the partnerships' use of negative amortization financing increased the risk of the investment. The memoranda made clear the leveraged nature of the investments and the way the partnerships used wraparound mortgages and negative amortization loans to finance the proper-

ties. Among the disclosures relating to leveraging discussed earlier in this opinion, the memoranda stated that "[l]everaging increases the Partnership's exposure to losses as well as the amount thereof." Therefore, because plaintiffs' allegations are flatly contradicted by the private placement memoranda, we do not accept them as true.

Underlying plaintiffs' general allegations of fraud is the suggestion (which never rises to the level of an allegation), supported by a paucity of facts, that CIGNA's investment advisors persuaded investors to place complete and total trust in them and the investment plans they recommended.[11] But the suggestion that investors followed blindly the investment advisors' recommendations is undermined when viewed in light of the extensive disclosures in the offering materials and the subscription agreements investors signed in which they expressly acknowledged the risky and speculative nature of the offering. More specifically, we note that the memoranda urged investors to consult with professionals for, among other things, legal and tax advice. The cover page of the memoranda stated: "EACH INVESTOR SHOULD CONSULT HIS OWN PERSONAL COUNSEL, ACCOUNTANT AND OTHER ADVISERS AS TO THE LEGAL, TAX, ECONOMIC AND RELATED MATTERS CONCERNING THE INVESTMENT DESCRIBED HEREIN AND ITS SUITABILITY FOR HIM." Thus, if plaintiffs relied exclusively on CIGNA's investment advisors in making their investment decisions, they did so in contravention of explicit warnings against such conduct.

Furthermore, plaintiffs were admonished not to rely on representations about the offering that did not appear in black and white in the offering materials. The memoranda stated that "NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE ANY INFORMATION, WITH RESPECT TO THESE UNITS, EXCEPT THE INFORMA-

11. Plaintiffs' thinly pleaded state law claim for breach of fiduciary duty is founded on this same suggestion.

TION CONTAINED HEREIN." And as defendants correctly note, several federal courts of appeals, including the Seventh Circuit, hold that investors are bound by written disclosures and warnings in offering documents as a matter of law, even if conflicting oral representations exist. This is because

> the securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires. Just as in the law of contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement. Otherwise even the most careful seller is at risk, for it is easy to claim: 'Despite what the written documents say, one of your agents told me something else.'

*Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir.1988).[12]

The Seventh Circuit reemphasized that same point in *Associates In Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992). There, the court dismissed wire and mail fraud claims of investors who allegedly relied on oral statements despite contrary statements in written offering materials. *Adolescent Psychiatry*, 941 F.2d at 570–71. The court noted that "[f]raud occurs only when a person of ordinary prudence and comprehension would rely on the misrepresentations." *Id.* at 570. Observing that the oral statements on which the investors allegedly relied were refuted in documentation that the defendant provided to the investors, the court concluded that "no reasonable investor would have been misled by the statements [defendant] related, when the truth was under his nose in black and white (many times over)." *Id.* Under *Acme Propane* and *Adolescent Psy-*

*chiatry*, therefore, if plaintiffs relied on representations outside of the offering materials, they did so at their peril.

Plaintiffs have not attempted to rebut defendants' amply supported contention that the offering materials contained information and warnings in stark contrast to the alleged misrepresentations that form the basis of plaintiffs' RICO claims. Instead, plaintiffs try to blunt the effect of the offering material's disclosures and warnings with essentially three arguments. All three arguments fail.

First, plaintiffs assert that cases such as *Acme Propane* and *Adolescent Psychiatry* are irrelevant because defendants were "not parties to the PPM" and therefore "cannot escape liability for its own misrepresentations by pointing to others' disclaimers." Plaintiffs' Brief in Opposition at 12–13. Initially, we note that with this argument plaintiffs contradict themselves. Through their securities fraud claims, plaintiffs ask the Court to hold CIGNA and the other defendants liable for purported misrepresentations in the private placement memoranda, even though CIGNA and the other defendants did not prepare the memoranda. Yet here, in furtherance of their RICO claims, plaintiffs argue that CIGNA and the other defendants cannot rely on information and disclaimers in the memoranda to fend off liability. Plaintiffs never explain why they believe that while the contents of the memoranda can be used against defendants, defendants should not be able to use the contents of those same memoranda to their advantage.

Additionally, regardless of who prepared the offering materials, those materials contained clear and complete information on the subjects that plaintiffs claim defendants misrepresented or failed to disclose. According to the Seventh Circuit, as long as the information is "publicly available," plaintiffs cannot sue for fraud. *Adolescent Psychiatry*, 941 F.2d at 570–71 (citation omitted) (rates of return available to

---

12. *Accord Foremost Guaranty Corp. v. Meritor Savings Bank,* 910 F.2d 118, 126 (4th Cir.1990) (despite contrary oral statements purchasers bound as a matter of law by written disclosures in offering memorandum); *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 802–03 (1st Cir.1987) (same); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983) (same).

plaintiff in Chicago Tribune and Wall Street Journal). The information contained in the private placement memoranda at issue here was certainly available to plaintiffs. In fact, it was prepared specifically for investors like plaintiffs. And plaintiffs warranted that they had reviewed the offering materials when they signed their subscription agreements.

Next, plaintiffs argue that some of them never received the memoranda and that CIGNA "down-played the importance" of the memoranda when selling the securities at issue. Plaintiffs' Brief in Opposition at 12–13. This argument is flatly contradicted by plaintiffs' own pleadings, which are judicial admissions. *See* Wright, Miller, & Kane, *Federal Practice and Procedure* § 1476 at 558 (1990). Plaintiffs allege repeatedly in their complaints that they bought the subject securities "in reliance on" the memoranda and the other offering materials. Indeed, plaintiffs identify the offering materials as the source of the alleged misrepresentations and omissions on which their complaints are premised; materials that plaintiffs now contend they never received or discounted based on CIGNA's sales pitch. Those same materials are also referenced in the investment summaries that plaintiffs attached to their most recent complaints.[13] And when they signed their subscription agreements, which contained many of the warnings and disclosures detailed in the memoranda, plaintiffs warranted that they had "received and read or reviewed" the memoranda and understood their contents.

Furthermore, defendants argue, we think persuasively, that plaintiffs' contention that CIGNA "down-played" the memoranda represents precisely the kind of argument that *Acme Propane* rejected. Written disclosures trump inconsistent oral statements "because otherwise even the most careful seller is at risk, for it is easy to claim: 'despite what the written documents say, one of your agents told me something else.'" *Acme Propane*, 844

F.2d at 1322. That the alleged oral misrepresentations came from CIGNA's investment advisors, who plaintiffs describe as their "hired agents," rather than the sellers agent, as in *Acme Propane*, is of little consequence. Like the investors in *Acme Propane* and *Adolescent Psychiatry*, plaintiffs cannot show a reasonable basis on which they could have been misled because "the truth was under [their] nose in black and white (many times over)." *Adolescent Psychiatry*, 941 F.2d at 570.

Finally, plaintiffs cite *Myers v. Finkle*, 950 F.2d 165 (4th Cir.1991) for the proposition that dismissal of this action is precluded by "fact questions" about their relationship with CIGNA advisors and the alleged oral representations that the advisors made. Plaintiffs' Brief in Opposition at 13. The court in *Myers* reversed the district court's summary judgment on a securities fraud claim brought by a family of investors against their accounting firm. *Myers*, 950 F.2d at 166. The court disagreed with the lower court's ruling that under Virginia law the firm did not owe a fiduciary duty to the investors for investment advice it gave them. *Id.* at 168.

The investor-plaintiffs in *Myers* alleged specific facts about their relationship with the accounting firm that arguably moved the relationship beyond a formal contractual one into a confidential or fiduciary relationship. Concluding that the plaintiffs had raised a material issue of fact on this point, the court emphasized the plaintiffs' allegation that they were "social friends" with one of the firm's accountants and several of his partners. *Id.* The plaintiffs also alleged that the firm had served as their accountants for at least 10 years and had "spent considerable amounts of time working closely with the [plaintiffs] on business matters." *Id.; cf. Burdett v. Miller*, 957 F.2d 1375, 1381–82 (7th Cir. 1992) (fiduciary relation established under Illinois law between investor and advisor where "relationship shad[ed] into a social

---

**13.** For example, the summaries note that (1) "[t]his investment summary is intended to be used solely in connection with the related private placement memorandum and is qualified in its entirety by information set forth therein," and (2) "[t]he memorandum contains important information concerning the investment and should be read carefully."

friendship" and advisor did not explain investments, provide prospectuses or advise investor to seek additional counsel). It was in this relational context that the *Myers* court viewed the alleged oral representations made by the accounting firm.

■ Here, in contrast, plaintiffs' general allegations about CIGNA's relations with its customers do not suggest anything more than an arms length business relationship. That CIGNA prepared "detailed financial plans to earn the trust and confidence of plaintiffs" does not, in and of itself, transform the relationship into a fiduciary one. *See Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir.1992) (under Illinois law, the "fact that one party trusts the other is insufficient" to establish a fiduciary relationship). Lacking specific factual allegations like those present in *Myers*, plaintiffs' complaints fail to raise fact questions about their relationship with CIGNA that might enable them to avoid dismissal. *See Id.* (citations omitted) (to establish fiduciary relationship under Illinois law, plaintiff "must plead ... specific facts which would support such a finding").

In sum, plaintiffs' RICO claims cannot stand. The RICO claims, which are founded on the theory of fraudulent inducement to invest, are undermined by the detailed and unequivocal disclosures contained in the offering materials. Not only is there a stark disparity between plaintiffs' purported understanding of the offering as a "conservative tax-advantaged investment[ ]," and explicit statements in the materials describing the offering as "high risk" and "speculative"; the offering materials also inform plaintiffs of the very matters and risks that they claim were not disclosed. Without a tenable claim of fraud to prop up their RICO claims, plaintiffs' RICO claims fall for failure to state a claim.[14]

**14.** Defendants also seek dismissal of plaintiffs' RICO claims on two additional grounds: (1) failure to satisfy the particularity requirement of Fed.R.Civ.P. 9(b); and (2) substantive RICO deficiencies. Because we dismiss plaintiffs' RICO claims under Fed.R.Civ.P. 12(b)(6), we do

## C. *State Law Claims*

■ Ordinarily, when the federal claims are dismissed before trial, as in this case, the state claims should be dismissed without prejudice under *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663, 682 (7th Cir. 1986), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). This is because once the federal claims are dismissed short of trial, "the considerations of judicial economy that underlie the doctrine of pendent jurisdiction are diminished and are outweighed by the inroads that the doctrine makes into the autonomy of state courts in matters of state law." *Burroughs v. Hills*, 741 F.2d 1525, 1539 (7th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985). This general rule is not applicable here, however, because the vast majority of plaintiffs' state law claims were not timely asserted in this Court. Thus, considerations of judicial economy and fairness to the litigants counsel the Court to address the statute of limitations issue instead of requiring the parties to duplicate their efforts by instituting the claims and rearguing the issue in state court.

■ Defendants assert that plaintiffs' state law claims for fraud, negligent misrepresentation and breach of fiduciary duty are time-barred under Illinois' five-year statute of limitations.[15] Defendants opine, quoting *Ravin v. A.H. Robins Co.*, 182 Ill.App.3d 46, 130 Ill.Dec. 953, 956, 538 N.E.2d 164, 167 (1 Dist.1989), that in Illinois the limitations period begins running when plaintiffs are "possessed of knowledge that placed [them] under an obligation to inquire further to determine whether or not an actionable wrong had been committed." Echoing their argument regarding RICO accrual, defendants contend that the exhaustive warnings and disclosures in the

not reach the other asserted grounds for dismissal.

**15.** Plaintiffs do not dispute the applicability of Illinois' five-year limitations period, which is codified at Ill.Rev.Stat. ch. 110, § 13–205 (1984).

offering materials "triggered the Illinois limitations period at the time of purchase." Defendants' Reply Brief at 9. Though we rejected defendants' accrual analysis as it applied to RICO, it appears that Illinois courts apply the discovery rule to fraud-based claims in a manner consistent with defendants' theory of accrual.

Although *Ravin* was a products liability action governed by a two-year limitations period, the court in *Melko v. Dionisio*, 219 Ill.App.3d 1048, 162 Ill.Dec. 623, 628, 580 N.E.2d 586, 591 (2 Dist.1991), applied the same accrual rule to decide when the five-year limitations period began running on the plaintiff's common law fraud claim. The plaintiff in *Melko* alleged that the defendant told her she was investing in "safe" CDs when in reality she had purchased uninsured corporate notes of a closely held company. *Melko*, 162 Ill.Dec. at 624, 580 N.E.2d at 587. The notes were labeled "SHORT–TERM CORPORATE NOTE" and did not use the term "Certificate of Deposit." *Id.* 162 Ill.Dec. at 625, 580 N.E.2d at 588. Moreover, the plaintiff signed documents stating that her investments were corporate notes, and that the investments were risky and speculative. *Id.* 162 Ill.Dec. at 629, 580 N.E.2d at 592. The *Melko* court stated that the limitations period

> begins to run when the plaintiff knows or reasonably should know that an injury has occurred and that it was wrongfully caused. *This is the point where the injured party possesses information sufficient to put a reasonable person on inquiry to determine whether actionable conduct is involved.*

*Id.* 162 Ill.Dec. at 628, 580 N.E.2d at 591 (emphasis supplied). Applying this accrual standard to the facts outlined above, the court held that "there can be no doubt at

all that plaintiff knew or should have known facts sufficient to put her on inquiry [of the alleged fraud] more than five years before she filed her complaint." *Id.* 162 Ill.Dec. at 665, 580 N.E.2d at 628; *see also Brideau v. Plantation Colony Apartments*, No. 91–CH–00261 (Cir.Ct. Cook County, Ill. Nov. 20, 1991) (claims time-barred under five-year limitations period because warnings and disclosures in private placement memoranda put plaintiffs on notice of their claims when they made their purchases).

■ *Melko* teaches that under Illinois law—and in contrast to civil RICO accrual—knowledge of injury is imputed to the plaintiff when he has notice of the possibly fraudulent conduct. Once the plaintiff knows or should know of the fraudulent activity, knowledge of a resulting injury is assumed. Thus, under *Melko*, the disparity between plaintiffs' understanding of the limited partnership offering and the warnings and disclosures in the offering materials, provided plaintiffs with sufficient facts to put them on notice that the subject securities were not "secure, conservative" investments, as they purportedly understood. The five-year limitations period began running, therefore, at the time they agreed to invest in the limited partnerships.

■ Because they filed their claims more than five years after they purchased their investments, plaintiffs' state law claims in *Iantuono, Reading* and *Spitz* are time-barred. *See supra* fn. 4. Plaintiffs in *Williams* filed their action more than four but less than five years after their purchases. *Id.* Except for those plaintiffs in *Williams* residing in Illinois or states having limitations period as long or longer than Illinois', the state law claims in *Williams* are also time-barred.[16]

16. This Court must apply the Illinois limitations period to the common law claims of out-of-state plaintiffs, *Kalmich v. Bruno*, 553 F.2d 549, 553 (7th Cir.1977), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977), unless the limitations period of the foreign jurisdiction for non-resident plaintiffs is shorter than Illinois' period. *See* Ill.Rev.Stat. ch. 110, § 13–210. The Illinois borrowing statute sets the outside time limit within which a claim must be brought. If the limitations period of the non-resident plaintiff's home state is shorter than Illinois', then the shorter limitations period controls. *LeBlanc v. G.D. Searle & Co.*, 178 Ill.App.3d 236, 127 Ill.Dec. 423, 426, 533 N.E.2d 41, 44 (Ill.App. 1 Dist 1988), *cert. denied*, 125 Ill.2d 566, 130 Ill. Dec. 482, 537 N.E.2d 811 (Sup.Ct.1989). For that reason, the claims of *Williams* plaintiffs who reside in states with a limitations period shorter than that of Illinois are time-barred.

198

■ The same policy concerns that call for a resolution of the limitations issue also require that we reach the merits of the relatively few state law claims in *Williams* that are not time-barred. It would not be fair or convenient to the parties, or an efficient use of judicial resources, to require the litigants to file a state court action to obtain an adjudication of the few remaining state claims. Resolution of those claims is especially appropriate here due to the substantial similarity between the legal issues presented and the "factual findings necessary to the resolution of the state and federal claims." *Harner*, 785 F.Supp. at 642 (jurisdiction over pendent state claims retained because "it would ill serve judicial economy to remand the common law fraud claim to the state court system where the same factual and legal issues will have to be considered anew").

■ The remaining claims in *Williams* for fraud and negligent misrepresentation fail for the same reasons that plaintiffs' RICO claims fail: the disclosures and warnings in the offering materials undermine the basis of the claims. Finally, the claims asserted in *Williams* for breach of fiduciary duty that are not time-barred are dismissed for failure to plead sufficient facts to support a finding of a fiduciary duty between plaintiffs and CIGNA.